1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name ___Spruell___ ___Vincent___ ___Lamell___
           (Last)       (First)       (Initial)

3
4    Prisoner Number ___C-80418___        ORIGINAL
     FILED

5    Institutional Address ___P.O. Box 689, Soledad, Ca 93960___
     FEB 2 8 2008

6
7    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA W. WIEKING
     DISTRICT OF CALIFORNIA

8    ___Vincent Lamell Spruell___   )   CV 08
     (Enter the full name of plaintiff in this action.)

9                ) 1204

10           vs.       )   Case No. _____
                 )   (To be provided by the clerk of court)

11   ___A. Kane, Warden___        )
                 )   **PETITION FOR A WRIT MMC**

12   ___Board of prison Hearing___    )   **OF HABEAS CORPUS**

13   ___State California___         )
                 )

14   _____ )
     (Enter the full name of respondent(s) or jailor in this action) )

15               )

16   Read Comments Carefully Before Filling In

17   **When and Where to File**

18       You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1   <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14           County Superior Court          Merced

15                  Court                          Location

16           (b)    Case number, if known  11630

17           (c)    Date and terms of sentence  2/6/84

18           (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                  parole or probation, etc.)         Yes  x     No _____

20                  Where?

21           Name of Institution: Central Training Facility

22           Address: P.O.Box, 689, Soledad, Ca.93960

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26       Murder second and Battery Assualt

27

28

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

    Arraignment:                         Yes __x__   No _____

    Preliminary Hearing:              Yes __x__   No _____

    Motion to Suppress:             Yes _____   No __x__

4. How did you plead?

    Guilty __x__    Not Guilty _____   Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __x__    Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?            Yes __x__   No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment               Yes __x__   No _____

    (b)    Preliminary hearing       Yes __x__   No _____

    (c)    Time of plea              Yes __x__   No _____

    (d)    Trial                      Yes __x__   No _____

    (e)    Sentencing               Yes __x__   No _____

    (f)    Appeal                   Yes __x__   No _____

    (g)    Other post-conviction proceeding   Yes _____   No __x__

8. Did you appeal your conviction?        Yes __x__   No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal           Yes __x__  No _____

        Year: __1985__    Result:_____ Denied _____

        Supreme Court of California    Yes _____  No __x__

        Year: _____    Result:_____

        Any other court           Yes _____  No __x__

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1    petition?                                    Yes _____    No__x__

2    (c)    Was there an opinion?                 Yes __x__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes _____    No__x__

5           If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?           Yes _____    No__x__

10          [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16          (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding. Attach extra paper if you need more space.

18          I.     Name of Court: _Superior Court, Merced_____

19                 Type of Proceeding: _Writ of Hebeas Corpus_____

20                 Grounds raised (Be brief but specific):
                   Petitioner's nine denialofrom the board of
21                 a._prison termwas not supported bysufficient_
                   evidence having an Indicia of reliability,
22                 b._Therefore was Arbitrary and capricious, vi
                   -olating his rights under the due process
23                 c._clause of the United State Constitution's_
                   5th and 14th Amendment, depriving him of h
24                 d._his federally protected Liberty interest.

25                 Result: _Denied_____Date of Result: _May 10,07_

26          II.    Name of Court: _Fifth Appellate, Court_____

27                 Type of Proceeding: _Writ of Hebeas Corpus_____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

a. Same as Superior Court _____

b. _____

c. _____

d. _____

Result: Denied _____ Date of Result: June 8, 07

III. Name of Court: Calif. Supreme Court _____

Type of Proceeding: Writ of Hebeas Corpus _____

Grounds raised (Be brief but specific):

a. Same as Suprior court _____

b. _____

c. _____

d. _____

Result: Denied _____ Date of Result: Jan, 16 08

IV. Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. Non-Applicable _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No  x

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened?

Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1   need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. **Subsequent**

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); **McCleskey v. Zant,**

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:___See Pg. 8_____

6        _____

7        Supporting Facts:_See Pg. 8_____

8        _____

9        _____

10       _____

11       Claim Two:_____

12       _____

13       Supporting Facts:_____

14       _____

15       _____

16       _____

17       Claim Three:_____

18       _____

19       Supporting Facts:_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____

26   _____

27   _____

28   _____

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4      Biggs v. Turhune (9th cir 2003) 334 F.3d 910, Irons v.Wa=

5    rden (E.D. Cal. 2005) 350F. Supp.2nd 936, See attached Lega

6    -l Argument.

7    Do you have an attorney for this petition?              Yes____     No_x_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _Feb.23, 2008_          _Vincent Sorrell_

14               Date              Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

G R O U N D    O N E

PETITIONER'S SEVENTH DENIAL OF PAROLE FROM THE BOARD OF PAROLE
HEARINGS WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE HAVING AN
INDICIA OF RELIABILILTY, THEREFORE WAS ARBITRARY AND CAPRICIOUS
VIOLATING HIS RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE
UNITED STATE'S CONSTITUTION 5TH AND 14TH AMENDMENTS,
DEPRIVING HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST.

a. Supporting Facts:

1.) Petitioner appeared before the Board of Parole Hearings and was denied
parole for the seventh time on May 30th, 2006, receiving a 1-year
denial. (See Exhibit "A", Board Hearing Transcript, incorporated by
reference as though set forth in full.)

2.) In (1983), petitioner was convicted of Second Degree Murder in the
California Superior Court, for the County of Merced. Petitioner accepts
full responsibility for the shooting of the victims in this case and
takes responsibiliity for the victim's death and the shooting of the
other. (Exhibit "A", p. 72-73); following a fight in which petitioner
was stabbed. (Exhibit "A", p. 103-105).

3.) The Board denied petitioner parole declaring as their reasons'. The
gravity of his crime, finding it was carried out in a especially cruel
and violent manner, in a manner which demonstrates an exceptional
callous disregard for human suffering, multipe victim were attacked,
(Exhibit "A", p. 103-104). Petitioner's prior record (pre-1983),
(Exhibit "A", p. 106-107). And the fact a second person involved in the
crime remains uncharged. The Board noted petitioner's has programmed
satisfactory in prison, receiving both his High School Diploma, and
(GED). He has continuously participated in NA/AA, and therapy. (See
Exhibit "A", p. 58-62). He also continued to upgrade Educationally,
Vocationally and has developed three marketable skills. (See Exhibit
"A", p. 107-108).

1    4.) No evidence demonstrates that petitioner planned to or actually

2        tormented, terrorized, or injured the victim before he died, that he

3        unnecessarily prolonged their pain and suffering through gratutous

4        cruelty: that he acted with could, calculated dispassion, or that his

5        act could possibly support conviction with special circumstance,

6        Petitioner's offense involved no aggravated violence. (See Exhibit "A").

7        His crime occurred in the heat of a fight. His actions were inexcusably

8        wrong, but not "particularly egregous." The crime which occurred

9        (23-years) ago cannot support parole denial, given petitioner's clear

10       demonstration of rehabilitation programming for a lengthy period

11       coupled with a lengthy period of disciplinary and crime free

12       behavior. The circumstances of the crime no longer have predictive

13       value given the 23-years that has passed since it occurred, given

14       petitioner's exemplary style prison record. (See In re Lee, (2006)

15       ___ Cal.App.4th ___ WL 2947968, *6; In re Scott, (2005) 133 Cal.App.4th

16       573, 595, 34 Cal.Rptr.3d 905.

17    5.) Petitioner has been free of serious disciplinary violations since

18        (1992). (See Exhibit "A", p. 108)

19    6.) During his imprisonment petitioner has participated in Educational,

20        Vocational, and Self-Help rehabilitation programming, including

21        attendance in numerous self-help groups including AA/NA. (See Exhibit

22        "A", p. 58-61).

23    7.) The (CDCR) Psychological Staff, evaluated  petitioner for the board and

24        found he would not pose an unreasonable risk of danger to the public

25        safety if released on parole, that he has a low potential for violence

26        in the free community, is an excellent candidate for parole, etc.

27        (See Exhibit "B", copy of petitioner's Psychological Reports,

28        incorporated by reference as though set forth in full.)

8.) In the life Prisoner Evaluation Report (LPER) prepared for the Board. Petitioner's Correctional Counselor, supported his parole release. (See Exhibit "C", petitioner's correctional counselor's (LPER) Report; incorporated by reference as though set forth in full) The (CDCR) Correctional Counselor believes petitioner would pose a low threat if released. Reasonable is the standard for release.

9.) Petitioner's prior criminal history pre-dates (1983). This record does not reflect his current state of mind as demonstrated by his behavior for over (23-years) since. Its' use is purely for punitive reasons, and currently has no current predictive value.

10.) When petitioner's is granted a parole date, California's **Penal Code**, § 3041(a), Parole Scheme mandates his term be set at one uniform with those of similar gravity, regardless of the number of years a prisoner has actually been in prison. The gravity based matrixes of 15 CCR, Division 2, Title 15, § 2403(c), second degree murder terms provide a table of graduated three part (High, Mid, Low) base terms for cross connected victim and crime circumstances, in order of increasing gravity. Using this matrix petitioner's term will be a Matrix III-(B) Base Term, of 18-19-20 Years. The victim were involved in a fight and used a knife, death occurred at the hospital, and the parties has little personal relationship.

Including application of (6-Years), Post-Conviction Credits to petitioner's actual (19-Years), he has already served a 25-Year first degree murder prison-term. Petitioner asserts his Federal and State Right to the Due Process of law is violated when the state fails to consider this fact and retains him in prison beyond his uniform term based on the facts of his crime.

MEMORANDUM OF POINTS AND AUTHORITIES

I.

PETITIONER HAS A FEDERALLY PROTECTED LIBERTY
INTEREST IN PAROLE RELEASE.

It is well established that all Indeterminate Sentenced prisoner
posses a federally protected liberty interest. See McQuillion v.
Duncan, (9th Cir. 2002) 306 F.3d 895, 901-902; Biggs v. Terhune, (9th
Cir. 2003) 334 F.d 910, 914-915, relying on Gr eenholtz v. Inmates of
Nebraska, (1979) 441 U.S. 1); Board of Pardons v. Allen, (1987) 482
U.S. 369, 377-378, clearly reasoning that the similar structure and
phrasing of California's parole statutes (Penal Code, § 3041,
subd. (b)); when compared to those of Nebraska and Montana procedures
the same resule in this state - a federally protected liberty interest.
A liberty interest, the Biggs', court held on pp. 914-915, arises
"upon incarceratiion of the inmate." As held by Sass v. California
Parole Board, (9th Cir. 2006) WL 2506, 393, the State decision in
In re Dannenberg, (2005) 34 Cal.4th 1061, is limited to the uniform
term provision of Penal Code sectiion 3041, subd. (a) and has no
bearing on the Ninth Circuit holding that the mandatory language of
Penal Code, § 3041, sub-section (b) creates a liberty interest in
parole.

II.

DENIAL OF PAROLE FOR THE SEVENTH TIME BASED ON THE
IMMUTABLE CIRCUMSTANCES OF THE COMMITMENT OFFENSE
WHILE IMPROPERLY DISCOUNTING HIS LONG TERM EXEMPLARY
PRISON PROGRAMMING, DEPRIVES A PRISONER OF DUE
PROCESS.

State and Federal Courts have repeatedly held that even if offense
circumstances are considered under regulatory law to support parole
denial, due process may preclude the crime alone justifying repeated
denials, in face of a prison record demonstrating rehabilitation (See

1  e.g. In re Smith, (2003) 114 Cal.App.4th 343, 372; Biggs v. Terhune,

2  (9th Cir. 2003) 334 F.3d 910-916-917; In re Scott, (2005) 34 Cal.Rptr.

3  3d 905, 919-920; Irons v. Warden, (E.D. Cal. 2005) 358 F Supp.2d 936,

4  947-948; In re Lee, (2006) ___ Cal.App.4th ___, WL 2947968, *6.)

5  Disregarding that standard, the Board of Parole Hearings denied

6  petitioner for the seventh time, again based on the unchanging factors

7  of his offense.

8  A finding that ignores or improperly discounts petitioner having

9  remained free of crime and his minimum disciplinary offense history

10  during his imprisonment, his having positively programmed and having

11  repeatedly demonstrated remorse for the resulting Loss of life.

12  As the record shows, petitioner has demonstrated his rehabilitation

13  by long term participation in programming such as Alcoholics Anonymous,

14  completing both his High School DipLoma, (GED), (see Exhibit "A", p.

15  58-62) and completing three Vocational (3) (Skills) programs (See

16  Exhibit "A", p. 107-108) educational improvement and successfully

17  working at various jobs. The CDCR Mental Health Staff evaluated

18  petitioner for the Board and support his release on parole, finding he

19  would not pose an unreasoanble risk of danger to public safety if

20  released on parole. (See Exhibit "B"):

21  Clearly referring to a prisoner having been denied parole numerous

22  times, in this matter seven times, based on unchangable factors, with a

23  prison record such as petitioner's, the court in Biggs v. Terhune,

24  supra, 334 F.3d, held:

25          "[While] the parole board's sole supportable reliance
        on the gravity of the offense and conduct prior to

26          imprisonment to justify denial of parole [may] be
        initially justified as fulfilling the requirements
        set forth by state law [O]ver time, however, should

27          [a prisoner] continue to demonstrate exemplary
        behavior and evidence of rehabilitation, denying

28          him parole simply because of the nature of his offense
        would raise serious questions involving his liberty
        interest in parole." (Id. at 916)

See **People v. Seal**, (2004) 34 Cal.4th 535, 536, the State Supreme Court held, "The degree of criminal culpabililty the legislature chooses to associate with particular, factual distinct conduct has significant implication both for a defendant's very liberty and the heightened stigma associated with an offense the legislature has selected worthy of greater punishment. (**Apprendi v. New Jursey**, (2002) 503 U.S. 466, 495. "The jury in this case found petitioner's culpability to be that of second degree murder, but not one of a higher degree premeditated crime. The Board's heightening of petitioner's culpability by insisting his conduct and elements were especially cruel and violent and demonstrated [an exceptional] disregard for human suffering, requiring he served a prison term allocated solely for that crime, runs counter to this Legislative Policy noted by the Supreme Court. While the uniform term for petitioner offense is a **California Code of Regulations, Title 15: (15 CCR)** § 2403(c) Matrix III-B, 18-19-20 (credit) year term, with his now 6-years of Post-Conviction Credit applied. Petitioner has now served a (25-Year) Prison term, a first degree murder term. To allow parole denial solely on the facts of the crime after a prisoner has served 6-years more than the Mid-Term for his offense circumstances; specified by the statute and regulation for the gravity (factual) circumstances of that crime can only be described as a unconstitutionally vague standard. See In re Dannenberg, supra, fn. 7, at pp. 1079, holding when a prisoner's term is set, it cannot be of a length lesser or greater than that specified by [statute and] regulation. On the other hand **Dannenberg**, permits parole denial based on facts of the offense which are more than the minimum necessary to support a conviction. A standard which is undefined and can arbitrarly be applied

to every murder offense. Petitioner thus has no idea of what is expected or prohibited in this matter, enabling his being retained in prison. The fn. 7 Dannenberg, standard or the minimum necessary standard? Such a conflict renders the state standard unconstitutionally vague. In this case the Board of Parole Hearings relied on alleged predictive value of petitioner's offense as a basis for parole denial at his seventh parole consideration hearing. Assessing a similar chronological situation, for a first degree Murder and associated crimes than offense committed by petitioner, a Federal District Court, judge reasoned that:

> "Whether the facts of the crime of conviction, or other unchanged criteria, affect the parole eligibility decision can only be predicted on the 'predictive value' of the unchanged circumstances. Otherwise, if the unchanged circumstances per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally reposited in the hand of (BPH). That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole – a sentence given with the facts of the crime fresh in the minds on the judge. While it would not be a constitutional violation to forgo parole altogether for certain crimes, what the state cannot do is have a sham system where the judge promises the possibility of parole, but because of the matter of the crime, the (BPT) effectively deletes such from the system. Nor can a parole system, where parole is mandated to be determined on someone's future potential to harm the community, constitutionally exist where despite 20 or more years of prison life which indicates the absence of danger to the community in the future, the (BPT) Commissioner's revulsion toward the crime itself, or some other unchanged circumstances must indicate a present danger to the community if released, and this can only be assessed not in a vacuum, after four or five eligibility hearing, but counterpoised against a backdrop of prison events. (Relying on Blair v. Folsom State Prison, (2005) WL 2219220 * 1s, n.3 (E. Cal. 2005) Report and Recommendation adopted by (2005) WL 3081634 (E.D. Ca. 2003).

Given the factual circumstances of this case, the repeated reliance on the unchanging circumstances of petitioner's crime as found by the court, and the de facto characterizing it as one of a higher culpability

14.

1   than factually found by the jury violates petitioner's due process.

2   (See Martin v. Marshall, (N. D. Cal. 2006) 431 F.Supp.2d 1038).

3      The continued reliance by the Board on unchanging factors make a

4   sham of the state's parole system. It amounts to an arbitrary denial

5   of petitioner's liberty Interest by converting His sentence from one

6   of 15-years to life, to that of a more serious first-degree-murder

7   crime carrying a sentence of 25-years to life or life without the

8   possibility of parole. Another court in a case with a far more serious

9   second degree murder crime than that committed by petitioner has

10   characterized this situation as follows:

11      "[C]ontinued reliance on unchanging circumstances .
        transforms an offense for which California law
12      provides parole eligibility into de facto life
        imprisonment without the possibility of parole.
13      The court ask rhetorically what is it about
        the circumstances of petitioner's crime or
14      motivation which are going to change?

15         The answer is nothing. The circumstances of
        the [crime] will always be [what it was].
16      Petitioner has no hope for ever obtaining parole
        except the perhaps that a panel in the future
17      will arbitrary hold that the circumstances were
        not that serious ... given that no one seriously
18      contends lack of seriousness ... at the present
        time, the potential for parole in this case is ›
19      remote to the point of non-existence. Petitioner's
        liberty interest should not be determined by such
20      an arbitrary, remote possibility." (Irons v.
        Warden, (E. D. Cal. 2005) 358 F.Supp.2d 936, 947.
21

22      By defining petitioner's culpability as higher than found by the

23   jury, and by continuing to rely on those factors after almost 25

24   (Credit) years of imprisonment as an indicator of present dangerousness,

25   given petitioner's very positive prison performance, positive, parole

26   supportive (CDCR) Psychological Evaluations, and his recognized solid

27   parole plans (See Exhibit "B", the board in this case has violated

28   due process.

15

1     The ability of the board to predict petitioner's future

2    dangerousness based on the circumstances of his commitment offense

3    and prior history is nill. **Irons, Id.** fn. 2 at 947. Also see,

4    In re Scott, supra, 133 Cal.App.4th at 595, 34 Cal.3d 905, holding:

5       "The commitment offense can negate suitability only if
        the circumstances of the crime reliably established
6       by evidence in the record rationally indicate that the
        offender will present an reasonable public safety risk
7       if released from prison. Yet, the predictive value of
        the commitment offense may be very questionable after
8       a long period of time." (**Id.**, at 920) "Therefore, an
        unsuitability determination must be predictive on
9       'some evidence' that the particular circumstances of
        [the prisoner's] crime-circumstances beyond the
10      minimum elements of this conviction indicate
        exceptional callousness and cruelty with trivial
11      provocation, and thus suggest he remain a danger to
        public safety." (In re Dannenberg, supra 34 Cal.4th
12      at 1098) "(Scott, Id. at 922)"

13    Nothing in petitioner's post-imprisonment record provides any

14    evidence of re-offending. Further his culpability and associated facts

15    cannot be declared to be higher than found by the jury. See **Blakey v.**

16    **Washington**, (2004) 542 U.S. 296, 124 S.CT. 2531, 154 L.Ed. 403,

17    holding that while a parole board may rule on the facts essential to

18    their discretion, these facts can not preclude the defendant's legal

19    right to lesser, penalty. Therefore, "the facts bearing on that

20    commitment [offense] must be found by a [trial court]." (**Id.**, 124 S.Ct.

21    at 2540, 154 L.Ed.2d at 417). Otherwise, punishment will be inflicted

22    which the jury's verdict does not allow, and a defendant's rights

23    under the **6th** Amendment violated (**Blakely, Ibid.**, at 2537, 414), as is

24    occurring in this case.

25               C O N C L U S I O N

26

27    As petitioner asserted as grounds for relief, [t]he Board of Parole

28    Hearings violated his due process rights by denying him parole based on

1    the unchanging factors or his offense and ignoring evidence of his
2    rehabilitation and good prison behavior. These repeated denials of
3    petitioner's parole based on the unchanging factors of his commitment
4    offense violate his constitutional rights to due process under the
5    5th and 14th Amendments of the **United States Constitution**, and **6th**
6    Amendment right to trial by jury. Repeated decisions clearly
7    unreasonable in light of the facts showing petitioner's long-term
8    positive prison record, his proven rehabilitation, and in light of the
9    comparatively lesser seriousness of second-degree-murder offense for
10   which he is to punished as versus punishment for first-degree-murder.
11   In fact, even a Board Commissioner commented petitioner on how positive
12   he spent his time. (See Exhibit "A", p. 112) clear indication of the
13   arbitrary of parole decisions in California.

14       Petitioner respectfully submits that accordingly the state parole
15   authority should be ordered to be release petitioner on parole
16   forthwith, and his period of parole be reduced by the four and one-half
17   year of extra imprisonment he has served.

17.

# EXHIBIT

# A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:              )        CDC Number C-80418
                         )
VINCENT SPRUELL          )
                         )
_____)        **INMATE**

**COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 30, 2006

3:49 P.M.

PANEL PRESENT:

Mr. Philip Inglee, Presiding Commissioner
Ms. Moore, Deputy Commissioner

OTHERS PRESENT:

Mr. Vincent Spruell, Inmate
Mr. Lewis, Attorney for Inmate
Mr. Tom Cooke, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

> _____  No    See Review of Hearing
> _____  Yes   Transcript Memorandum

**Leeanna L. Brown, Peters Shorthand Reporting**

ii

## INDEX

                                                    PAGE

Proceedings....................................... 1

Case Factors..................................... 11

Pre-Commitment Factors........................... 38

Post-Commitment Factors.......................... 57

Parole Plans..................................... 45

Closing Statements............................... 62

Recess.......................................... 102

Decision........................................ 103

Adjournment..................................... 115

Transcriber Certification....................... 116

--oOo--

1

| | |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | **DEPUTY COMMISSIONER MOORE:** We're on the |
| 3 | record at 3:50, 49. |
| 4 | **PRESIDING COMMISSIONER INGLEE:** Thank |
| 5 | you. This is a Subsequent Parole Consideration |
| 6 | Hearing. This is for Vi- Vincent Spruell, can |
| 7 | you just how you pronounce your last name? |
| 8 | **INMATE SPRUELL:** Spruell. |
| 9 | **PRESIDING COMMISSIONER INGLEE:** Spruell? |
| 10 | **INMATE SPRUELL:** Yes. |
| 11 | **PRESIDING COMMISSIONER INGLEE:** Thank |
| 12 | you. Capital S-P-R-U-E-L-L, CDC number C-8-0-4- |
| 13 | 1-8. Date is the May the 30th, 2006. Time is |
| 14 | 3:49 p.m. We are located at CTF Soledad. |
| 15 | Inmate was received on 2/9 of 1984. Committed |
| 16 | from Merced County. Life Term began on 3/1 of |
| 17 | 1988. Inmate's minimum eligible parole date is |
| 18 | 11/4 of 1997. Controlling offense for which the |
| 19 | Inmate had been committed is set forth in Case |
| 20 | number 11630, charge in Count One, Second Degree |
| 21 | Murder with the use of firearm, violation of |
| 22 | Penal Code Section P-187 and 12022.5. Could you |
| 23 | put us on hold for just one moment please? |
| 24 | **DEPUTY COMMISSIONER MOORE:** Sure, one |
| 25 | moment. |
| 26 | (Off the Record) |
| 27 | **DEPUTY COMMISSIONER MOORE:** We're back on |

1   the record.

2       **PRESIDING COMMISSIONER INGLEE:**   Other

3   counts on which the Inmate is committed are as

4   follows, Assault with a firearm PC-245, Bracket

5   A, Bracket 2, again same county, Merced, case,

6   same Case number.   Count number two, Great

7   bodily injury PC-12022.7, Merced County same

8   Case number and Count Two -

9       **DEPUTY COMMISSIONER MOORE:**   12022.7 is an

10   enhancement to the 245 A2.

11      **PRESIDING COMMISSIONER INGLEE:**   Okay, I

12   understand now.  So they're both Count Two.  All

13   right, thank you.  All right, Inmate received a

14   term of base of fifteen years, plus eight years

15   for enhancement or 22-23 years to Life.  This

16   hearing is being tape recorded for the purpose

17   of the direction of the case, (indiscernible)

18   will require to state our first and last names,

19   spelling our last names, when it comes to the

20   Inmate's turn, after you spell your last name,

21   state your CDC number.  Starting with myself and

22   going to my left, my name is Philip Inglee

23   that's I-N-G-L-E-E and I'm a Commissioner.

24      **DEPUTY COMMISSIONER MOORE:**   I'm Deputy

25   Commissioner Moore, M-O-O-R-E with the Board of

26   Parole Hearings.

27      **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

3

1   Tom Cooke,

2   C-O-O-K-E, Merced District Attorney's Office.

3        **ATTORNEY LEWIS:** (indiscernible) Lewis,

4   L-E-W-I-S, attorney for Mr. Spruell.

5        **INMATE SPRUELL:** Vincent Spruell,

6   S-P-R-U-E-L-L, C-8-0-4-1-8.

7        **PRESIDING COMMISSIONER INGLEE:** All right

8   thank you very much.  Spruell would you please

9   read in front of you the ADA Statement, read

10  that out loud?

11       **INMATE SPRUELL:** The American Disability

12  Act is a law to help people with disabilities.

13  Disabilities are the problems that make their-

14  make it harder for some people to see, hear,

15  breathe, talk, walk, learn, think, work or take

16  care of themselves then it is for others.

17  Nobody can be kept out of public places or

18  activities because of a disability.  If you have

19  a disability, you have the right to ask for help

20  to get ready for your Board Hearing, to get to

21  Hearing, talk, or read forms and papers, and

22  understand the Hearing process.  The BPT would

23  look at what you asked for to make sure that you

24  have a disability that is covered by the ADA and

25  that you have the asked for the right kind of

26  help.  If you do not get help or if you do not

27  think you got the kind of help you need, ask the

4

1   BPT 1074, 1074 Grievance Form.  You can also get

2   help to fill it out.

3           PRESIDING COMMISSIONER INGLEE:  Did you

4   understand what you read?

5           INMATE SPRUELL:  Yes.

6           PRESIDING COMMISSIONER INGLEE:  Fine,

7   thank you.  The record reflects you signed a BPT

8   form 1073, which is a reasonable accommodation

9   (indiscernible) request in accordance with

10  (indiscernible) American Disability Act.  You

11  signed then on 7/6 of 2005.  At that time you

12  said you did not need any help for having to get

13  to the Parole Hearing, is that still correct?

14          INMATE SPRUELL:  Yes.

15          PRESIDING COMMISSIONER INGLEE:  All

16  right.  I'm gonna have ques- a couple questions

17  to this regard.  Do you have any problems

18  walking up and down the stairs or for a distance

19  a hundred yards or more?

20          INMATE SPRUELL:  No, Sir.

21          PRESIDING COMMISSIONER INGLEE:  Do you

22  need glasses or magnifying glass in order to see

23  or read documents?

24          INMATE SPRUELL:  Yes.

25          PRESIDING COMMISSIONER INGLEE:  The

26  glasses you have on today, are they adequate for

27  this Hearing?

5

1           **INMATE SPRUELL:**  Yes.

2           **PRESIDING COMMISSIONER INGLEE:**  Have you

3   ever been included in a CCMS or an EOP program?

4           **INMATE SPRUELL:**  No.

5           **PRESIDING COMMISSIONER INGLEE:**  Do you

6   know what these programs are?

7           **INMATE SPRUELL:**  Yes.

8           **PRESIDING COMMISSIONER INGLEE:**  What are

9   they?

10          **INMATE SPRUELL:**  Mental Health.

11          **PRESIDING COMMISSIONER INGLEE:**  You got

12  it.  Have you ever taken psychotropic

13  medication, either in prison or on the streets?

14          **INMATE SPRUELL:**  No, Sir.

15          **PRESIDING COMMISSIONER INGLEE:**  How far

16  did you go in school before you arrived in

17  prison?

18          **INMATE SPRUELL:**  Eleventh grade.

19          **PRESIDING COMMISSIONER INGLEE:**  And you -

20  did you take any Special Education classes while

21  you were growing up?

22          **INMATE SPRUELL:**  No.

23          **PRESIDING COMMISSIONER INGLEE:**  Do you

24  suffer from any disability that prevents you

25  from participating in today's Hearing?

26          **INMATE SPRUELL:**  No.

27          **PRESIDING COMMISSIONER INGLEE:**  Counsel,

6

1  do you have any comments or concern regarding

2  your client's ADA rights?

3          **ATTORNEY LEWIS:**  No I do not.

4          **PRESIDING COMMISSIONER INGLEE:**  Hearing

5  is being conducted pursuant to Penal Code

6  Sections 3041, 3042, and the Rules and

7  Regulations of Board of Prison Terms governing

8  the role, Parole Consideration Hearings for Life

9  inmates.  The purpose of today's Hearing is to

10  consider your suitability of parole.  In doing

11  so we will consider the number and nature of the

12  crimes you were committed for, your prior

13  criminal social history, your behavior and

14  programming since your commitment.  We've had

15  the opportunity to review your Central File and

16  your prior Hearing transcript.  You will - you

17  will be given an opportunity to correct and

18  clarify the record, we will consider your

19  progress since your commitment and since your

20  last Hearing.  Your updated Counselor's report,

21  and Psychological report will also be

22  considered.  Any change in Parole Plans should

23  be brought to our attention.  We will reach a

24  decision today and inform you whether or not we

25  find you suitable for parole and the reasons for

26  our decision.  If you are found suitable for

27  parole, the length and time of your confinement,

7

1   excuse me, will be explained to you. This
2   Hearing will be conducted in two phases, I'll
3   discuss to you, the crimes you were committed
4   for, your prior criminal social history, your
5   parole dates and plans, any letters of support
6   and opposition that may be in file. Deputy
7   Commissioner Moore will discuss with you your
8   progress since your commitment, your Counselor's
9   report and your Psychological Evaluation. Once
10  that's concluded, the Commissioners, the
11  District Attorney, and your attorney will be
12  given the opportunity to ask you questions. The
13  questions from the District Attorney will be
14  asked through the Chair and your answers will be
15  directed to the Panel. In other words, District
16  Attorney asks you questions, you don't answer
17  and speak to him directly, you speak to me or
18  you speak to us over here, okay?

19          **INMATE SPRUELL:** Okay.

20          **PRESIDING COMMISSIONER INGLEE:** All
21  right. Before we recess for deliberations, the
22  District Attorney and your attorney will be
23  given an opportunity to make final statements
24  regarding your parole suitability. Your
25  statement should be directed as to why you feel
26  you are suitable for parole. We will then
27  recess, clear the room and deliberate. Once

8

1    we've had a completed our deliberations, we will

2    resume our Hearing and we will then and at that

3    point announce our decision.  California Code of

4    Regulations states that regardless of time

5    served the Life Inmate shall be found unsuitable

6    for, and denied parole if in the judgment of the

7    Panel, the Inmate would pose an unreasonable

8    risk of danger to society if released from

9    prison.  You have certain rights, the rights

10   include the right to timely notice of the

11   Hearing, the right to review your Central File

12   and the right to re- present relevant documents.

13   Counselor, has your Inmate's rights been met in

14   this regard?

15        **ATTORNEY LEWIS:**  Yes they have.

16        **PRESIDING COMMISSIONER INGLEE:**  You also

17   have the right to be heard by an impartial

18   Panel.  In this regard, Mr. Spruell, is there

19   any - do you have any objections to any member

20   of this Panel?

21        **INMATE SPRUELL:**  No.

22        **PRESIDING COMMISSIONER INGLEE:**  Counsel,

23   do you have any objections to any member -of this

24   Panel?

25        **ATTORNEY LEWIS:**  No, I do not.

26        **PRESIDING COMMISSIONER INGLEE:**  You will

27   receive a copy of a written tentative decision

9

1  today.  That decision is subject to review by
2  Decision Review Unit, by the entire Board
3  meeting as a body.  It will become effective
4  within 120 days, also subject to review of the
5  Governor. A copy of the tentative decision and a
6  copy of the transcript will be sent to you.  As
7  of May 1st, 2004, there were major changes
8  limiting your former rights of appeal Board
9  decisions or actions directly to the Board.  The
10  old Board regulations were repealed.  The
11  current policy is entitled to Administrative
12  Appeals Correspondence and Grievances Concerning
13  Board of Prison Terms Decisions.  It is
14  available at the Prison Law Library for your
15  review.  You are not required to admit your
16  offense or discuss your offense if you do not
17  wish to do so; however, this Panel does accept
18  as true the findings of the Court, and you are
19  invited to discuss the facts and circumstances
20  of the offense of you so desire.  The Board will
21  review and consider any prior statements you
22  have made regarding the offense in determining
23  your suitability for parole.  Deputy
24  Commissioner is there any confidential material
25  in the file and if so, will it be used today?
26      **DEPUTY COMMISSIONER MOORE:**  There is no
27  confidential material present.

10

1       **PRESIDING COMMISSIONER INGLEE:** All

2  right, thank you.  I passed a hearing checklist,

3  marked Exhibit 1 onto your attorney and asked

4  your attorney to ensure that we're all

5  proceeding from the same set of documents, the

6  District Attorney, do you have all your

7  documents?

8       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

9  Yes, thank you.

10      **PRESIDING COMMISSIONER INGLEE:** And

11 Counsel, do you have all your documents?

12      **ATTORNEY LEWIS:** Yes I do.

13      **PRESIDING COMMISSIONER INGLEE:** Thank

14 you.  Are there any additional documents to be

15 submitted this morn- afternoon?

16      **ATTORNEY LEWIS:** No we do not have any

17 documents because the - the support letters that

18 my client showed me are already in a file.

19      **PRESIDING COMMISSIONER INGLEE:** All

20 right, okay.  If for any reason we leave

21 anything out, Mr. Spruell all you have to do is

22 mention it to your attorney and we'll be happy

23 to - to look at those.  Do you have any

24 preliminary objections?

25      **ATTORNEY LEWIS:** No I do not.

26      **PRESIDING COMMISSIONER INGLEE:** Will your

27 Inmate be speaking to the Panel?

11

1          **ATTORNEY LEWIS:**  Yes he will be.

2          **PRESIDING COMMISSIONER INGLEE:**  On all

3    subjects?

4          **ATTORNEY LEWIS:**  Yes.

5          **PRESIDING COMMISSIONER INGLEE:**  Okay.

6    With that, will you please raise your right

7    hand?  Do you solemnly swear or affirm the

8    testimony you give at this hearing will be the

9    truth, the whole truth and nothing but the

10   truth?

11         **INMATE SPRUELL:**  Yes.

12         **PRESIDING COMMISSIONER INGLEE:**  Thank

13   you.  Counsel if you have no objections we will

14   incorporate, by reference, the statement of fact

15   and that will come from the Appellate decision,

16   pages three and four.

17         **ATTORNEY LEWIS:**  That will be fine.

18         **PRESIDING COMMISSIONER INGLEE:**  Okay.

19   Mr. Spruell?

20         **INMATE SPRUELL:**  Yes, Sir?

21         **PRESIDING COMMISSIONER INGLEE:**  It was a

22   complicated day, your crime, tell us what

23   happened.

24         **INMATE SPRUELL:**  Well it all began at

25   Violet Delicatessen on J Street and I left

26   there, going towards my cousin, Jerrel David on

27   Eleventh, on Eleventh and K Street.  Mr. Lopez,

12

1    Frank Trevino, Angel Gloria, and Angel Torres
2    came out of the apartments adjacent to us, where
3    we had a altercation.  Mr. Lopez pulled a knife
4    on me and slashed me across my side.  I pulled a
5    weapon and started shooting –

6         **PRESIDING COMMISSIONER INGLEE:**  Let me
7    ask a question, it was across your side, it was
8    not on your face?

9         **INMATE SPRUELL:**  No, just across my side.
10        **PRESIDING COMMISSIONER INGLEE:**  Was it –
11   did it end up being a scratch, or did it end up
12   being and actual incision into your body?

13        **INMATE SPRUELL:**  It was – it was – it was
14   a scratch, I had a thick sweater on.  I had a
15   thick sweater on that night.

16        **PRESIDING COMMISSIONER INGLEE:**  But – but
17   – but it seems to me in reading this, it said
18   scratch.

19        **INMATE SPRUELL:**  Well it was – like he
20   slashed me across my side.

21        **PRESIDING COMMISSIONER INGLEE:**  By the
22   way that doesn't –

23        **INMATE SPRUELL:**  Okay –

24        **PRESIDING COMMISSIONER INGLEE:**  That
25   doesn't change what he meant to do to you, I'm
26   just curious –

27        **INMATE SPRUELL:**  Right.

13

1      **PRESIDING COMMISSIONER INGLEE:**  As to

2   what, but in fact it was a scratch.

3      **INMATE SPRUELL:**  Okay.

4      **PRESIDING COMMISSIONER INGLEE:**  All

5   right.  Go ahead.

6      **INMATE SPRUELL:**  And fighting ensued, he

7   cut me across my side with a knife and I started

8   shooting.  Right after that, other gunshots

9   would fire.  I ducked behind a car and to find

10  out where the other gun shots –

11     **PRESIDING COMMISSIONER INGLEE:**  I'm going

12  to stop you again and ask you questions –

13     **INMATE SPRUELL:**  Okay.

14     **PRESIDING COMMISSIONER INGLEE:**  Just –

15  just bear with me on these things we – that's

16  the reason why we're here today for you to tell

17  us and for us to ask questions.

18     **INMATE SPRUELL:**  Okay.

19     **PRESIDING COMMISSIONER INGLEE:**  What

20  caliber pistol did you have?

21     **INMATE SPRUELL:**  I believe I had a 22

22  caliber pistol.

23     **PRESIDING COMMISSIONER INGLEE:**  When you

24  said you believe –

25     **INMATE SPRUELL:**  Yes?

26     **PRESIDING COMMISSIONER INGLEE:**  It's a

27  weapon you had carried for a short at least some

14

1  time?

2      **INMATE SPRUELL:**  Yes, I had found - I had
3  found it.

4      **PRESIDING COMMISSIONER INGLEE:**  Would you
5  not have known it was a 22?

6      **INMATE SPRUELL:**  Well no, I knew - I knew
7  if that was a 22 and to my belief it was a 22,
8  yes.

9      **PRESIDING COMMISSIONER INGLEE:**  Okay well
10  you did fire a 22 -

11      **INMATE SPRUELL:**  Yes.

12      **PRESIDING COMMISSIONER INGLEE:**  Caliber
13  weapon then?  All right and where did you get
14  that weapon?

15      **INMATE SPRUELL:**  I found it at - at
16  Mitchell's Pool Hall, in the parking lot.

17      **PRESIDING COMMISSIONER INGLEE:**  Obviously
18  an illegal weapon?

19      **INMATE SPRUELL:**  Yes.

20      **PRESIDING COMMISSIONER INGLEE:**  I'm
21  making the assumption it was an illegal weapon.

22      **INMATE SPRUELL:**  Yes.

23      **PRESIDING COMMISSIONER INGLEE:**  Had you
24  ever fired that specific weapon before?

25      **INMATE SPRUELL:**  No.

26      **PRESIDING COMMISSIONER INGLEE:**  Had you
27  ever fired a pistol before?

15

1         INMATE SPRUELL:  No.

2         PRESIDING COMMISSIONER INGLEE:  Had you

3    ever fired a rifle before?

4         INMATE SPRUELL:  Yes, as a kid.

5         PRESIDING COMMISSIONER INGLEE:  But you

6    were not an experienced shooter?

7         INMATE SPRUELL:  No.

8         PRESIDING COMMISSIONER INGLEE:  You

9    didn't go, no one had took you out to a - to a

10   range or took you out to a field or someplace

11   to- to fire it?

12        INMATE SPRUELL:  No.

13        PRESIDING COMMISSIONER INGLEE:  Okay, go

14   ahead.

15        INMATE SPRUELL:  After that, after the

16   shooting occurred, we jumped in the car and we

17   drove to my cousin Darrel - D- Darrel Turner's

18   house where we all left from there.

19        PRESIDING COMMISSIONER INGLEE:  Okay.

20   You were a member of a gang, is that correct?

21        INMATE SPRUELL:  No.

22        PRESIDING COMMISSIONER INGLEE:  It says

23   here that - that you were a member of the

24   Playboys.

25        INMATE SPRUELL:  Correct.

26        PRESIDING COMMISSIONER INGLEE:  You were

27   a member of a gang or you weren't a member of a

16

1  gang?

2          **INMATE SPRUELL:**  No, I was not a member

3   of a gang but I was a member of the Merced V.I.P

4   Playboys, we are the dance group.

5          **PRESIDING COMMISSIONER INGLEE:**  It was

6   not a gang?

7          **INMATE SPRUELL:**  No.

8          **PRESIDING COMMISSIONER INGLEE:**  Do you

9   have any tattoos?

10         **INMATE SPRUELL:**  Yes.

11         **PRESIDING COMMISSIONER INGLEE:**  And what

12  kind of tattoos do you have?

13         **INMATE SPRUELL:**  Just one of my

14  grandfather, right there.

15         **PRESIDING COMMISSIONER INGLEE:**  So you

16  have no - you have no -

17         **INMATE SPRUELL:**  No gang affiliation.

18         **PRESIDING COMMISSIÓNER INGLEE:**  Gang

19  tattoos?

20         **INMATE SPRUELL:**  No.

21         **PRESIDING COMMISSIONER INGLEE:**  The man

22  that you - the young man that you had the - the

23  hassle with, had the- were they members of a

24  gang?

25         **INMATE SPRUELL:**  I wouldn't know.

26         **PRESIDING COMMISSIONER INGLEE:**  You

27  wouldn't have recognized them as -

17

1        **INMATE SPRUELL:** No.

2        **PRESIDING COMMISSIONER INGLEE:** A rival
3   gang?

4        **INMATE SPRUELL:** No. Can I - I just want
5   to stipulate something from - from the Merced
6   V.I.P. Playboys, we was a dance group that pop
7   locked. If you guys are familiar with that. We
8   just had competition against other dance groups,
9   that's all we were.

10       **PRESIDING COMMISSIONER INGLEE:** In the
11   Probation Officer's Report on page 12, the
12   Probation Officer noted that the Defendant
13   appeared to be a member of the street gang
14   locally known - locally known as the Playboys.
15   Now why would they have reference, they may have
16   been inconsistent or may have been wrong whether
17   you remember or not, but why would they have
18   made a mistake and feel the Playboys were a
19   dance group and not a gang?

20       **INMATE SPRUELL:** I - I wasn't - I - I
21   couldn't answer that.

22       **PRESIDING COMMISSIONER INGLEE:** It was
23   also noted that the current offense is
24   considered a gang related by investigating
25   detectives.

26       **INMATE SPRUELL:** I - I couldn't answer
27   that.

18

1          **PRESIDING COMMISSIONER INGLEE:**  The

2     Probation Officer's report also said officers

3     contacted a female witness who said the incident

4     was a gang shooting and it was results of

5     tensions which had been building for several

6     months.  The female advised Officer's McDowell,

7     both victims were members of a gang headed by

8     Tommy, I assume this would be the Latino fellas,

9     Gutierrez and were responsible for members of a

10    gang of and were – and the responsibles were

11    members of a gang of blacks headed by Wyatt

12    Turner and Michael Turner.  Are you familiar

13    with Wyatt Turner and Michael Turner?

14         **INMATE SPRUELL:**  Yes.

15         **PRESIDING COMMISSIONER INGLEE:**  She

16    advised that large fight was brewing.  No that

17    doesn't – okay, I just want to be sure that you

18    knew you may have already read that in the –

19         **INMATE SPRUELL:**  Yes.

20         **PRESIDING COMMISSIONER INGLEE:**  Probation

21    Officer's report before.

22         **INMATE SPRUELL:**  Correct.

23         **PRESIDING COMMISSIONER INGLEE:**  All

24    right, just want to be sure we understand.  All

25    right, go ahead.

26         **INMATE SPRUELL:**  Right after that we,

27    like I said, we went over to my girl, my – my

19

1    cousin Derrel Turner's house where I left after

2    that and that was when I got picked up pr- right

3    after that.

4         **PRESIDING COMMISSIONER INGLEE:**  You

5    believe that you - you were defending yourself

6    that - that your was a - it was a case of simple

7    defense?

8         **INMATE SPRUELL:**  Yes.

9         **PRESIDING COMMISSIONER INGLEE:**  And

10   therefore you, did you have that defense when

11   you were went to court?

12        **INMATE SPRUELL:**  Yes.

13        **PRESIDING COMMISSIONER INGLEE:**  That was

14   reviewed by the Appellate Court and sure, I'm

15   sure you're aware.

16        **INMATE SPRUELL:**  Uh - huh.

17        **PRESIDING COMMISSIONER INGLEE:**  And they

18   reaffirmed the jury decision.

19        **INMATE SPRUELL:**  Correct.

20        **PRESIDING COMMISSIONER INGLEE:**  I'm gonna

21   read from the Appellate Decision portion, in

22   regard to the actual fight itself.  Mr. Lopez

23   was fighting with the Defendant, that being

24   yourself, and one Darrel High, while Trevino

25   fought Derrel Turner and somebody else, Lopez

26   that Lopez did not recognize.  The fist fight

27   between Lopez and the Defendant lasted about ten

20

1    seconds before the Defendant took a step

2    backward and pulled a gun.  He fired and hit

3    Lopez, Lopez told Trevino he had been shot and

4    Lopez then came to his aide.  With Lopez

5    supporting Lo- excuse me, with Trevino

6    supporting Lopez, they were leaving the fight

7    scene when Trevino suddenly let go of Lopez and

8    knelt to the ground holding his wrist.  As Lopez

9    and Trevino first ran from the scene, Lopez

10   heard three shots fired that he thought were

11   from two different guns.  More shots were fired

12   as Lopez turned around and looked back at

13   Trevino.  Lopez saw Defendant pointing his gun

14   and firing several shots.  When Trevino fell

15   straight back, Tyrone Turner jumped into the

16   Continental, pulled the seat forward and the

17   Defendant jumped in the back seat, as you just

18   referenced.  Okay.  Anything else about the

19   crime you'd like to mention?

20          **INMATE SPRUELL:**  Not that I know of, no.

21          **PRESIDING COMMISSIONER INGLEE:**  Okay, do

22   you have any questions, Ms. Moore?

23          **DEPUTY COMMISSIONER MOORE:**  Yes.  Several

24   weeks before this incident, there had been a

25   fight, is that right?

26          **INMATE SPRUELL:**  Correct.

27          **DEPUTY COMMISSIONER MOORE:**  And was that

21

1   between Trevino and Lopez's group and the V.I.P.

2   Playboys?

3         INMATE SPRUELL:  No.

4         DEPUTY COMMISSIONER MOORE:  Well what

5   happened in the fight that occurred three weeks

6   before?

7         INMATE SPRUELL:  Three weeks before?

8         DEPUTY COMMISSIONER MOORE:  Uh - huh.

9         INMATE SPRUELL:  I thought it was a week

10  before that you're speaking of.

11        DEPUTY COMMISSIONER MOORE:  Okay.

12        INMATE SPRUELL:  At - at - at - at the

13  Fairground?

14        DEPUTY COMMISSIONER MOORE:  Right.

15        INMATE SPRUELL:  Yes.

16        DEPUTY COMMISSIONER MOORE:  Tell me about

17  that.

18        INMATE SPRUELL:  If was a fight that

19  occurred with Michael Turner and Michael Turner

20  and Wyatt Turner, I believe, at the Fairground.

21        DEPUTY COMMISSIONER MOORE:  And who else

22  was involved with it?

23        INMATE SPRUELL:  I was there, yes.

24        DEPUTY COMMISSIONER MOORE:  And who was

25  the fight with?

26        INMATE SPRUELL:  With Raul Lopez and

27  Angel Gloria.

1        **DEPUTY COMMISSIONER MOORE:**  Not Trevino?

2        **INMATE SPRUELL:**  I think that Frank was

3    there too.

4        **DEPUTY COMMISSIONER MOORE:**  Okay, and

5    what was the cause of that fight?

6        **INMATE SPRUELL:**  I - I - I really

7    couldn't answer that, I wouldn't know.

8        **DEPUTY COMMISSIONER MOORE:**  Was it about

9    Black and Mexican?

10       **INMATE SPRUELL:**  No, not that - from my

11   understanding, no.  When I came up, it was just

12   started right there.

13       **DEPUTY COMMISSIONER MOORE:**  And were -

14       **INMATE SPRUELL:**  It wasn't - it wasn't

15   Black or Mexican or gang or none of that.

16       **DEPUTY COMMISSIONER MOORE:**  And what

17   happened in that fight?

18       **INMATE SPRUELL:**  Well the Officers came

19   and everybody went their own way.

20       **DEPUTY COMMISSIONER MOORE:**  What happened

21   in the fight?

22       **INMATE SPRUELL:**  It was just a

23   altercation and the Officers came and everybody

24   dispersed, it wasn't was no -

25       **DEPUTY COMMISSIONER MOORE:**  Did you throw

26   a punch?

27       **INMATE SPRUELL:**  No.

23

1    **DEPUTY COMMISSIONER MOORE:**  Did anyone

2    throw a punch?

3    **INMATE SPRUELL:**  Well yeah, it was a

4    altercation, physical altercation.

5    **DEPUTY COMMISSIONER MOORE:**  Tell me about

6    it.

7    **INMATE SPRUELL:**  It was like a fight and

8    a couple blows were threw –

9    **DEPUTY COMMISSIONER MOORE:**  You – who

10   threw them?

11   **INMATE SPRUELL:**  Everybody, all – all

12   three of us.

13   **DEPUTY COMMISSIONER MOORE:**  You just told

14   me you didn't.

15   **INMATE SPRUELL:**  Well no – no I had to

16   defend myself yeah, I was in there fighting but

17   we – it was just a couple blows and Officers

18   came and dispersed it.

19   **DEPUTY COMMISSIONER MOORE:**  Any weapons?

20   **INMATE SPRUELL:**  No.

21   **DEPUTY COMMISSIONER MOORE:**  In your

22   Probation report, did you tell the Probation

23   Officer that Lopez had a weapon?

24   **INMATE SPRUELL:**  It was the next night,

25   he pulled a pistol and I ran from the

26   Fairgrounds.

27   **DEPUTY COMMISSIONER MOORE:**  On the date

24

1   that the - this - this murder happened, how did

2   you come, how did you come in contact with

3   Lopez, Trevino, Gloria and Torres?

4        **INMATE SPRUELL:**  We were at Byrite

5   (phonetic) Delicatessen and they - they drove up

6   and went around the corner and came out through

7   the apartments behind us.

8        **DEPUTY COMMISSIONER MOORE:**  And what

9   happened?

10       **INMATE SPRUELL:**  Then that's when the

11  fight started.

12       **DEPUTY COMMISSIONER MOORE:**  Tell me how

13  it happened.

14       **INMATE SPRUELL:**  We was walking, after -

15  after the - after they left, my cousin Derrel

16  Turner and I, we went down Eleventh Street to go

17  over my cousin Derrel Davis' house.  Raul Lopez,

18  Angel Gloria, Frank Trevino and Angel Torres

19  came out of apartments adjacent to us, as we was

20  walking.  When I felt something come across my

21  side and I pulled a pistol.

22       **DEPUTY COMMISSIONER MOORE:**  Prior to

23  that, wasn't there a fight, punches thrown,

24  something happened before Lopez showed up with a

25  knife.

26       **INMATE SPRUELL:**  Yeah at - at - at

27  Byrite.

25

1       **DEPUTY COMMISSIONER MOORE:** And what
2   happened?
3       **INMATE SPRUELL:** It was the altercation
4   at - at Byrite, but it really wasn't an
5   altercation.
6       **DEPUTY COMMISSIONER MOORE:** Tell me what
7   that was.
8       **INMATE SPRUELL:** It was just words being
9   exchanged. That was it.
10      **DEPUTY COMMISSIONER MOORE:** Wasn't there
11  a punch thrown?
12      **INMATE SPRUELL:** No.
13      **DEPUTY COMMISSIONER MOORE:** Didn't you
14  tell the Probation Officer that Angel Gloria
15  looked like he was on drugs and he was gonna hit
16  me, so I hit him first?
17      **INMATE SPRUELL:** No, not - not to my
18  knowledge I didn't. That happened in, that
19  night at the Fairground.
20      **DEPUTY COMMISSIONER MOORE:** A week or two
21  after the fight started, we was by Byrite and I
22  seen Frank Trevino, Ray Corea and Angel Gloria
23  and I started talking to Angel. I guess -he
24  seemed like he was on drugs. He acted like he
25  was on drugs. He looked at me like he was going
26  to swing so I hit him first. Then about 15 or
27  20 minutes later, my cousin, Derrel Turner left.

26

1    As we got almost back to the car - so I'm gonna
2    stop there, was there an incident with Angel
3    Gloria be-
4         **INMATE SPRUELL:**  Ye- yeah he was there.
5    He was there.
6         **DEPUTY COMMISSIONER MOORE:**  Did you punch
7    Angel Gloria?
8         **INMATE SPRUELL:**  Not to my knowledge, I -
9    I can't remember if I punched him or not but he
10   was there, yes.
11        **DEPUTY COMMISSIONER MOORE:**  So there was
12   an altercation -
13        **INMATE SPRUELL:**  Words were exchanged -
14        **DEPUTY COMMISSIONER MOORE:**  What - what
15   ended that one?
16        **INMATE SPRUELL:**  You know, they just got
17   in their car and left.
18        **DEPUTY COMMISSIONER MOORE:**  Okay and how
19   much later was it that you had contact with
20   them?
21        **INMATE SPRUELL:**  Maybe about 15 or 20
22   minutes later.
23        **DEPUTY COMMISSIONER MOORE:**  Okay.  And
24   where was your gun?
25        **INMATE SPRUELL:**  I had it on me at the
26   time.
27        **DEPUTY COMMISSIONER MOORE:**  Where?

27

1      **INMATE SPRUELL:** In my little satchel, I
2   had a little satchel I kept my wallet and
3   everything.
4      **DEPUTY COMMISSIONER MOORE:** On a - on
5   your belt or in your hand?
6      **INMATE SPRUELL:** No it's like a little
7   satchel that hung over your shoulder.
8      **DEPUTY COMMISSIONER MOORE:** Okay.
9   Loaded?
10     **INMATE SPRUELL:** Yes.
11     **DEPUTY COMMISSIONER MOORE:** On the same
12  and you carried on the same side that you were
13  scratched, cut with the knife?
14     **INMATE SPRUELL:** Yeah at the time I just
15  had it in my hand though, I just had the satchel
16  in my hand.
17     **DEPUTY COMMISSIONER MOORE:** Any other
18  guns in the car?
19     **INMATE SPRUELL:** No.
20     **DEPUTY COMMISSIONER MOORE:** You sure?
21     **INMATE SPRUELL:** Yes.
22     **DEPUTY COMMISSIONER MOORE:** So you
23  indicate you had a 22, the police found a 25
24  caliber shell casings -
25     **INMATE SPRUELL:** Correct.
26     **DEPUTY COMMISSIONER MOORE:** In your
27  cousin Turner's car.

28

1      **INMATE SPRUELL:**  Correct.

2      **DEPUTY COMMISSIONER MOORE:**

3   (indiscernible)

4      **INMATE SPRUELL:**  I can't answer that.  No

5   shots came out of the car.  I - once I heard

6   other shots, I ducked behind the car.

7      **DEPUTY COMMISSIONER MOORE:**  Where did the

8   other shots come from?

9      **INMATE SPRUELL:**  They came from over by

10   the apartment building somewhere.  That's why I

11   ducked behind the car, I didn't know where they

12   were coming from.

13      **DEPUTY COMMISSIONER MOORE:**  Were the

14   apartments behind you or were they behind

15   Trevino and Lopez?

16      **INMATE SPRUELL:**  They was behind us.

17      **DEPUTY COMMISSIONER MOORE:**  So someone

18   was shooting at Trevino and Lopez?

19      **INMATE SPRUELL:**  It might have been,

20   might have been shooting at us, I couldn't

21   answer that.  That's why when I heard the shots,

22   I ducked behind the car.

23      **DEPUTY COMMISSIONER MOORE:**  What did

24   Lopez say before he swung the knife at you?

25      **INMATE SPRUELL:**  He didn't he just ran

26   out of the apartments and sw- slung it across my

27   side.

29

1      **DEPUTY COMMISSIONER MOORE:**  Well how far
2    were you from the apartments, did he come with
3    you blazing with the knife?

4      **INMATE SPRUELL:**  Well, from here to
5    there.   The apartment's not that far from the
6    sidewalk.

7      **DEPUTY COMMISSIONER MOORE:**  Fifteen feet?

8      **INMATE SPRUELL:**  Yeah, that's not that
9    far from the sidewalk.

10     **DEPUTY COMMISSIONER MOORE:**  And how was
11   he holding the knife?

12     **INMATE SPRUELL:**  He just came acro- I was
13   talking to my cousin like this, and he came
14   across, he just came out of the apartment, I
15   thought there was kids playing.

16     **DEPUTY COMMISSIONER MOORE:**  My question
17   was, how was he holding the knife?

18     **INMATE SPRUELL:**  I couldn't answer that.

19     **DEPUTY COMMISSIONER MOORE:**  Above his
20   head?

21     **INMATE SPRUELL:**  No.   No, I couldn't
22   answer that question for the simple fact that I
23   was talking to my cousin, looking in a whole
24   different way.

25     **DEPUTY COMMISSIONER MOORE:**  Then how do
26   you know he slashed you with the knife?

27     **INMATE SPRUELL:**  Because when I stepped

30

1  back, I seen him with the knife.

2      **DEPUTY COMMISSIONER MOORE:**  And what did

3  he say?

4      **INMATE SPRUELL:**  He didn't say nothing,

5  it was a altercation, it wasn't - we wasn't

6  talking, we was just trying to -

7      **DEPUTY COMMISSIONER MOORE:**  What happened

8  after he slashed you with the knife?

9      **INMATE SPRUELL:**  I pulled the gun out and

10  I fired two shots.

11      **DEPUTY COMMISSIONER MOORE:**  How far away

12  was he when you fired two shots?

13      **INMATE SPRUELL:**  We were about from here

14  to this guy right here.

15      **DEPUTY COMMISSIONER MOORE:**  To the

16  Correctional Officer, you're pointing?

17      **INMATE SPRUELL:**  Yes.  Yes.

18      **DEPUTY COMMISSIONER MOORE:**  About six,

19  seven feet?

20      **INMATE SPRUELL:**  If that's six, seven

21  feet, a couple - couple feet.

22      **DEPUTY COMMISSIONER MOORE:**  So you - you

23  fired two shots at Lopez while he had a knife in

24  his hand?

25      **INMATE SPRUELL:**  Yes.

26      **DEPUTY COMMISSIONER MOORE:**  Where was

27  Trevino?

31

1        **INMATE SPRUELL:**  Well I, at that time, I

2    didn't see Frank.  I didn't see Frank at all

3    until af- after.

4        **DEPUTY COMMISSIONER MOORE:**  So, your

5    gun's in a satchel that's zippered?

6        **INMATE SPRUELL:**  No, buttoned.

7        **DEPUTY COMMISSIONER MOORE:**  Buttoned?

8        **INMATE SPRUELL:**  Yes.

9        **DEPUTY COMMISSIONER MOORE:**  So you're

10   cute with a knife, you have your satchel in your

11   hand -

12       **INMATE SPRUELL:**  Yes.

13       **DEPUTY COMMISSIONER MOORE:**  You open it

14   up, reach in, you take out the gun and shoot

15   twice at Lopez?

16       **INMATE SPRUELL:**  Yes, I just pulled it

17   right out.  I didn't have to unbutton it, I just

18   pulled it right out.

19       **DEPUTY COMMISSIONER MOORE:**

20   Semi-automatic or revolver?

21       **INMATE SPRUELL:**  It was like a little

22   revolver.

23       **DEPUTY COMMISSIONER MOORE:**  Which one -

24   well what -

25       **INMATE SPRUELL:**  It was a revolver.

26       **DEPUTY COMMISSIONER MOORE:**  A revolver?

27       **INMATE SPRUELL:**  Yes.

32

1     **DEPUTY COMMISSIONER MOORE:**  Where was
2  Frank?

3     **INMATE SPRUELL:**  I didn't see Frank till
4  af- after Raul started backing up.

5     **DEPUTY COMMISSIONER MOORE:**  Did you tell
6  the Probation Officer that you saw Frank run up?

7     **INMATE SPRUELL:**  No I said- I told the
8  Probation Officer I seen Frank when he fell on
9  the ground.

10     **DEPUTY COMMISSIONER MOORE:**  The first
11  bullet hit Lopez in the shoulder, the first
12  shot.  The second shot, then Frank ran up and I
13  fired up toward the air trying to scare him away
14  from me.  They say I hit him but I don't see
15  how.  Then I seen Frank when he fell on the
16  ground.  Then all these other shots was fired.
17  So Frank was already on the ground when the
18  other shots were fired?

19     **INMATE SPRUELL:**  No, shots was being
20  fired all the time.  That's why I ducked behind
21  the car.  That's when I seen Frank when he fell
22  on the ground.

23     **DEPUTY COMMISSIONER MOORE:**  So did you
24  tell the Probation Officer, though, that Frank
25  was already on the ground?

26     **INMATE SPRUELL:**  Yeah, when I seen him,
27  yes.

33

1    **DEPUTY COMMISSIONER MOORE:** Did you tell

2    him that he was already on the ground after you

3    fired your two shots?

4    **INMATE SPRUELL:** I don't recall.  I

5    thought I told him that after I ducked behind

6    the car, I seen him get – get hit and fall on

7    the ground.

8    **DEPUTY COMMISSIONER MOORE:** Did you tell

9    the Probation Officer that the shot fired over

10   the head of Trevino may well have hit him?  Did

11   you tell that to the Probation Officer?

12   **INMATE SPRUELL:** Yeah I – I might have

13   told him that.

14   **DEPUTY COMMISSIONER MOORE:** So why were

15   you walking around with a gun?

16   **INMATE SPRUELL:** For protection.

17   **DEPUTY COMMISSIONER MOORE:** From what?

18   **INMATE SPRUELL:** They had pulled a pistol

19   on me about a week earlier.

20   **DEPUTY COMMISSIONER MOORE:** Who?

21   **INMATE SPRUELL:** Raul Lopez, Frank

22   Trevino, Angel Gloria.

23   **DEPUTY COMMISSIONER MOORE:** Why?

24   **INMATE SPRUELL:** Because of the

25   altercation we had at the Fairground that day.

26   **DEPUTY COMMISSIONER MOORE:** And what was-

27   **INMATE SPRUELL:** A couple days before.

34

1       **DEPUTY COMMISSIONER MOORE:**  And what was
2  the cause of that altercation?

3       **INMATE SPRUELL:**  Just 'cause they didn't
4  like each other.  I think - I think Wyatt had
5  had a altercation with one of their friends or
6  something like that prior to that.

7       **DEPUTY COMMISSIONER MOORE:**  You can
8  understand it's - I would imagine you can
9  understand why this sounds like a gang -

10      **INMATE SPRUELL:**  Yes -

11      **DEPUTY COMMISSIONER MOORE:**  Incident.

12      **INMATE SPRUELL:**  I can understand that.

13      **DEPUTY COMMISSIONER MOORE:**  Did you call
14  9-1-1 after the shooting?

15      **INMATE SPRUELL:**  No Sir, no Ma'am, I
16  didn't.

17      **DEPUTY COMMISSIONER MOORE:**  Didn't seek
18  medical help for Trevino or Lopez?

19      **INMATE SPRUELL:**  No.

20      **DEPUTY COMMISSIONER MOORE:**  And, for my
21  information, was anyone else prosecuted in this
22  case?

23      **INMATE SPRUELL:**  No.

24      **DEPUTY COMMISSIONER MOORE:**  Okay, that's
25  all the questions I have about the case.

26      **PRESIDING COMMISSIONER INGLEE:**  Okay.
27  Did you know the victim, before he - the - the -

1   the, I realize there was two victims, Lopez and

2   Trevino, did you know Trevino beforehand?

3       **INMATE SPRUELL:**  No, not personally, no.

4   But I seen him around town.

5       **PRESIDING COMMISSIONER INGLEE:**  You just

6   knew of him as a –

7       **INMATE SPRUELL:**  I just seen him around

8   town, yes.

9       **PRESIDING COMMISSIONER INGLEE:**  And

10  you've had – you had trouble with he and his

11  group?

12      **INMATE SPRUELL:**  No ju- not prior to

13  those first couple weeks, no.

14      **PRESIDING COMMISSIONER INGLEE:**  All

15  right.  Did you know of anybody else in your,

16  with you that day, your friends –

17      **INMATE SPRUELL:**  Okay.

18      **PRESIDING COMMISSIONER INGLEE:**  Playboys,

19  or whoever they may have been, or whatever

20  organization they may or may not have been in,

21  but anybody had a pistol besides you, besides

22  yourself?

23      **INMATE SPRUELL:**  No.

24      **PRESIDING COMMISSIONER INGLEE:**  Who was

25  firing the other pistol?

26      **INMATE SPRUELL:**  I couldn't answer that

27  question, I ducked behind the car.  I didn't

36

1  know where the shots was coming from.

2       **PRESIDING COMMISSIONER INGLEE:**  So as far

3  as you know, there, as far as you knew, nobody

4  else had a pistol?

5       **INMATE SPRUELL:**  As far as I knew, yes.

6       **PRESIDING COMMISSIONER INGLEE:**  They may

7  have had, but you didn't know of anybody else.

8       **INMATE SPRUELL:**  I didn't know about it,

9  yes.

10      **PRESIDING COMMISSIONER INGLEE:**  And of

11 course, I think it's axiomatic to assume you

12 didn't see somebody pull a pistol out and - and

13 use it?

14      **INMATE SPRUELL:**  Correct.

15      **DEPUTY COMMISSIONER MOORE:**  Did you hear

16 another pistol being shot?

17      **INMATE SPRUELL:**  Oh I heard other

18 gunshots, yes, that's why I ducked behind the

19 car.

20      **PRESIDING COMMISSIONER INGLEE:**  How cl-

21 how close was it?

22      **INMATE SPRUELL:**  Well they - they were

23 behind me, they were just coming from behind me

24 so I ducked behind the car to see where they

25 were coming from.

26      **PRESIDING COMMISSIONER INGLEE:**  So it

27 would have been your friends?

1      **INMATE SPRUELL:**  Well it - yes it could
2   have been.

3      **PRESIDING COMMISSIONER INGLEE:**  It would
4   - you assume been your friends, there 'cause
5   they were behind you versus being to your front?

6      **INMATE SPRUELL:**  Well yes.

7      **PRESIDING COMMISSIONER INGLEE:**  After the
8   - after the shooting was over and you guys got
9   in your car and took off -

10     **INMATE SPRUELL:**  Uh - huh?

11     **PRESIDING COMMISSIONER INGLEE:**  Later,
12  Police Officers found 25 caliber rounds in the
13  car and around the - the area where the fight
14  took place?

15     **INMATE SPRUELL:**  Yes.

16     **PRESIDING COMMISSIONER INGLEE:**  Nobody in
17  your group made any reference at all to
18  (indiscernible) a pistol?'

19     **INMATE SPRUELL:**  No, outside myself.  I
20  admitted to that.

21     **PRESIDING COMMISSIONER INGLEE:**  Before or
22  after?

23     **INMATE SPRUELL:**  No.

24     **PRESIDING COMMISSIONER INGLEE:**  And you
25  had one pistol?

26     **INMATE SPRUELL:**  Yes.

27     **PRESIDING COMMISSIONER INGLEE:**  And you

38

1    believe that was a 2- and you, I think you keep
2    using the term I think it was a 22?
3         **INMATE SPRUELL:** Well ye- I - I believe
4    it was a 22.  It was a caliber pistol yes.
5         **PRESIDING COMMISSIONER INGLEE:** But you
6    also admitted you didn't know pistols very well?
7         **INMATE SPRUELL:** Yes, that's true.
8         **PRESIDING COMMISSIONER INGLEE:** So it
9    could have been a 25 caliber?
10        **INMATE SPRUELL:** Well if - if you - if
11   you ask me if it was a automatic, or a semi-
12   automatic, I know it was a caliber pistol -
13        **PRESIDING COMMISSIONER INGLEE:** Oh sure,
14   I understand that.
15        **INMATE SPRUELL:** Yes.
16        **PRESIDING COMMISSIONER INGLEE:** Okay.
17   All right.  Okay, anything else about the crime
18   you'd like to discuss?
19        **INMATE SPRUELL:** No.
20        **PRESIDING COMMISSIONER INGLEE:** Let's
21   take a look at your criminal history.  On 9/8 of
22   1975, Merced P.D. arrested you for Battery?
23        **INMATE SPRUELL:** Yes.
24        **PRESIDING COMMISSIONER INGLEE:** It was
25   dismissed.  You had been arrested for
26   responsibility for assaulting a - a minor in a
27   bathroom at a local park.

39

1        **INMATE SPRUELL:** I'm not familiar with
2   that.
3        **PRESIDING COMMISSIONER INGLEE:** You've
4   not heard of that before?
5        **INMATE SPRUELL:** Yeah I heard it, but I'm
6   not familiar with, it was dismissed, I wasn't
7   familiar with the –
8        **PRESIDING COMMISSIONER INGLEE:** But you
9   know this report, though?
10       **INMATE SPRUELL:** Yes.
11       **PRESIDING COMMISSIONER INGLEE:** You've
12   seen this –
13       **INMATE SPRUELL:** Yes.
14       **PRESIDING COMMISSIONER INGLEE:** This rap
15   sheet?
16       **INMATE SPRUELL:** Yes.
17       **PRESIDING COMMISSIONER INGLEE:** Okay.  If
18   not, I was going to take time to let your –
19       **INMATE SPRUELL:** Oh I –
20       **PRESIDING COMMISSIONER INGLEE:** Attorney-
21       **INMATE SPRUELL:** I know it's there.
22       **PRESIDING COMMISSIONER INGLEE:** All
23   right.  On 3/20 of 1978, again Merced P.D., you
24   were arrested for Child Molestation.  This was
25   also dismissed at intake, in this case the
26   Defendant and several other juveniles had been
27   involved in fondling the breasts and genitals of

40

1    several female students at a local Junior High

2    School.  You recall that?

3         **INMATE SPRUELL:**  Yes.  Would you like for

4    me to e- elaborate on it?

5         **PRESIDING COMMISSIONER INGLEE:**  It was

6    dismissed.

7         **INMATE SPRUELL:**  Okay.

8         **PRESIDING COMMISSIONER INGLEE:**  We're

9    taking a look at what you were arrested for and

10   what your pattern - pattern of arrests are.  3/4

11   of 1982, Atwater P.D., Trespassing on school

12   grounds.  This was also dismissed.  3/26/1981,

13   Merced P.D., Petty Theft, you were given six

14   months and formal probation, restitution, one

15   day in juvenile work program.  Report indicates

16   the Defendant and other juveniles were

17   responsible for shoplifting a pair of tennis

18   shoes from a local store.  8/3 of 1981 Merced

19   P.D., Violation of a curfew, that was also dis-

20   that was dismissed.  Then 11/2 of 1981, Merced

21   P.D., Assault with great bodily injury.  In this

22   case, you were found to be in violation of

23   Section 242 PC, Ward-ship Restitution, ten days

24   of Juvenile Work Program, ten days Juvenile

25   Hall.  This regard, the victim had apparently

26   sustained a broken nose and the co-responsi- for

27   it - responsibility for this offense was

41

1    committed to the California Youth Authority by

2    Juvenile Court.  Defendant had been kept in

3    Juvenile Probation for his past - past his 18th

4    birthday because his failure to pay restitution.

5    Mrs. Ledesma noted that Defendant, and she

6    probably was a Parole Officer or Parole

7    Official, and his mother were less than

8    cooperative at times with the Probation

9    Supervision attempts and she advised the

10   undersigned that she gave the Defendant a poor

11   prognosis when she wrote in her termination,

12   somebody, because she felt that the - the

13   Defendant would again be referred or arrested

14   for a violent offense.  In the case of adult,

15   you were arrested for a series of traffic

16   violations.  That in themselves would not be

17   important if it wasn't for the nature of the

18   violation in this regard,'the Defendant was

19   sentenced to serve two days in jail for alcohol

20   related traffic offenses, by the Merced

21   Municipal Court.  At the same time the Defendant

22   also received five days in jail for separate

23   traffic offenses and failure to appear,  _

24   additional five days in jail for other traffic

25   offenses and failure to appear offenses.  Do you

26   recall those (indiscernible) ?

27        **INMATE SPRUELL:**  No, I only had one

42

1    ticket from Merced County on one you said that I
2    had several, I only had - I think it was a open
3    container in a car or and a bicycle ticket or
4    something like that?

5         **PRESIDING COMMISSIONER INGLEE:** Okay, any
6    other comments?  Whatever comments you'd like to
7    make on - on anything I've just gone over with
8    you.

9         **INMATE SPRUELL:** No -

10        **PRESIDING COMMISSIONER INGLEE:** It was as
11   series, in many cases with the exception of
12   great bodily harm and wh- and possibly the child
13   molestation issue which appears to - it was
14   dismissed so therefore that, we can pass through
15   that.  But it appears to be a series of scrapes
16   with the - with the law, of which most of them
17   were dismissed probably because of age, or lack
18   of interest on the police or possibly a lack of
19   evidence but, you certainly kept very active for
20   - for a certain period of time.  Okay.  Let's
21   take a look at your personal history.  Spruell
22   was born in Merced, California on 2/23 of 1964.
23   He is the third of six children, born to his
24   mother, Charlotte - Charlotte Pierce, Spruell's
25   father, Harry James Guidry, G-U-I-D-R-Y,
26   established a common law relationship with
27   Spruell's mother, which lasted about a year.  In

43

1    1966, Mrs. Pierce, P-I-E-R-C-E, established a
2    common law relationship with Thurman Dinkins,
3    D-I-N-K-I-N-S, Spruell's step-father.  Spruell
4    was never married, nor has he fathered any
5    children.  He completed the eleventh grade
6    before dropping out of Merced High School.  he
7    attended Yosemite High School Cot- Continuation
8    but did not complete his education.  His only
9    employment was with the CETA, capital
10   C-E-T-A/Manpower as a warehouseman at Castle Air
11   Force Base from July to September 1983.  Never
12   served in the military.  Spruell stated that he
13   drank alcohol and used marijuana.  Spruell had
14   what - had an arrest for child molestation,
15   which involved several juveniles who had fondled
16   the breasts and genitals of several female
17   students at a Junior High School.  The charges
18   were dismissed in this case.  No psychological
19   disorder has been noted.  Okay, anything about
20   your personal life you'd like to mention?

21       **INMATE SPRUELL:**  Well on - on - on the
22   child molestation you were just speaking on, I
23   was a 12-year old kid in the sixth grade, me and
24   five other of my schoolmates were playing with
25   our schoolmates.  Two of the young gentlemen got
26   aggressive so we was called to the office, there
27   was a report given by the principal to the

44

1    parents.  Later on it came out, as you found, it

2    was dismissed because two of the young men took

3    blame for it and they told on them, said it was

4    them and not us, so that's why I was dismissed.

5          **PRESIDING COMMISSIONER INGLEE:**  Okay,

6    good.  Anything else?

7          **INMATE SPRUELL:**  No.

8          **PRESIDING COMMISSIONER INGLEE:**  Anything

9    in there that may have led to where you are

10   today?  I mean, your past criminality?

11         **INMATE SPRUELL:**  No I don't think so.

12         **PRESIDING COMMISSIONER INGLEE:**  That lead

13   to - well we keep dancing around this issue of

14   gangs and does your neighborhood have gangs?

15   That lead to - well we keep dancing around this

16   issue of gangs and does your neighborhood have

17   gangs? **INMATE SPRUELL:**  No, Merced didn't have

18   gangs at that time.

19         **PRESIDING COMMISSIONER INGLEE:**  District

20   Attorney, is that, you substantiate that, the

21   period of time?

22         **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

23   No I don't.

24         **PRESIDING COMMISSIONER INGLEE:**  Okay.

25   And the Playboys were not - were not a gang?

26         **INMATE SPRUELL:**  No, they were the dance

27   group.

45

1       **PRESIDING COMMISSIONER INGLEE:**  Okay.

2   Are they still a dance group?

3       **INMATE SPRUELL:**  No, they're no longer

4   dancing anymore.

5       **PRESIDING COMMISSIONER INGLEE:**  Are there

6   any gangs in the Merced area by the name of

7   Playboys, today?

8       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

9   No.

10      **PRESIDING COMMISSIONER INGLEE:**  All

11  right, let's move on to your Parole Plans.

12  Spruell plans to reside with his brother,

13  Thurman Dinkins in Merced, California.  He's

14  also been offered a home with is aunt, Peaches

15  Poole, in Los Angeles, California.  Spruell

16  plans to work at Food 4 Less, where his brother,

17  Thurman Dinkins, is a manager.  All right, let's

18  take a look at your letters.  We have a less- we

19  have a letter from Darrel and Darrel E. Davis

20  and family.  You - you have four letters here,

21  and I'm gonna make the assumption they're all -

22  they're all fine, but unfortunately they lack

23  two, they lack signatures.  If you don't get a

24  date today, let me suggest when you get these

25  things back a second time -

26      **INMATE SPRUELL:**  Uh - huh?

27      **PRESIDING COMMISSIONER INGLEE:**  Have

46

1    these - have these with signatures on it.

2         INMATE SPRUELL:  Okay.

3         PRESIDING COMMISSIONER INGLEE:  You're -

4    you're a bright guy, you know about computers,

5    you can see how word processing -

6         INMATE SPRUELL:  Yes.

7         PRESIDING COMMISSIONER INGLEE:  These

8    things can be, one person can sit here and thump

9    out a hundred letters with different names on

10   them -

11        INMATE SPRUELL:  Okay.

12        PRESIDING COMMISSIONER INGLEE:

13   (indiscernible) and - and does the signature

14   make it right?  No, but if there's addresses and

15   signature on it and there's a family

16   relationship that makes us far more comfortable

17   when we look at these letters.

18        INMATE SPRUELL:  Okay.

19        PRESIDING COMMISSIONER INGLEE:  I do know

20   you may not like what I just said but you might-

21        INMATE SPRUELL:  Oh, I understand -

22        PRESIDING COMMISSIONER INGLEE:

23   Understand our concern.

24        INMATE SPRUELL:  Yes, I understand.

25        PRESIDING COMMISSIONER INGLEE:  All

26   right.  (indiscernible)  a case, we do have this

27   from the - from Davis and family, and they offer

47

1   you a residence.  Unfortunately, they don't have

2   down the location, where's - where do they live?

3          **ATTORNEY LEWIS:**  Answer the question.

4          **INMATE SPRUELL:**  Where?

5          **PRESIDING COMMISSIONER INGLEE:**  Where do

6   they live?

7          **INMATE SPRUELL:**  In Merced.

8          **PRESIDING COMMISSIONER INGLEE:**  Merced,

9   okay.  It's just not on the letter.  You have a

10  letter from Thurman Dinkins -

11         **INMATE SPRUELL:**  Yes, that's my brother.

12         **PRESIDING COMMISSIONER INGLEE:**  That does

13  have a da- date on it or address on it in

14  Merced.  If paroled, Vincent will have a place

15  of residence, another very nice letters from

16  your brother.  He does offer you a re- a

17  residence, again it's an unsigned letter.  I'll

18  accept it for what it is.'

19         **INMATE SPRUELL:**  Okay.

20         **PRESIDING COMMISSIONER INGLEE:**  But

21  again, like I said, if you have another reason

22  to come back again, have these things signed.

23         **INMATE SPRUELL:**  I will.

24         **PRESIDING COMMISSIONER INGLEE:**  This is a

25  letter from your uncle, this is - or is this, no

26  this is from an aunt.

27         **INMATE SPRUELL:**  Yes, my aunt.

48

1       **PRESIDING COMMISSIONER INGLEE:**  And

2  that's Ms. N. Mack?

3       **INMATE SPRUELL:**  No, that's my niece.

4       **PRESIDING COMMISSIONER INGLEE:**  Okay.  Is

5  your niece, does she have the ability to offer

6  you a place to live?

7       **INMATE SPRUELL:**  Yes, she works as a

8  Colonoxstrofy (phonetic), she works at a

9  hospital.

10      **PRESIDING COMMISSIONER INGLEE:**  Okay.  My

11  family and I would provide him with a p- with a

12  residence.  All right, now this- same thing, I'm

13  not going -

14      **INMATE SPRUELL:**  Okay.

15      **PRESIDING COMMISSIONER INGLEE:**  To go

16  over the signature thing with you again.  You

17  have another one, this is from - from Robert

18  Pierce, P-I-E-R-C-E, he doesn't directly offer

19  you place of residence, but he says I will

20  assist him with a place of residence -

21      **INMATE SPRUELL:**  Uh - huh.

22      **PRESIDING COMMISSIONER INGLEE:**  Which is

23  probably a support letter for you.

24      **INMATE SPRUELL:**  Okay.

25      **PRESIDING COMMISSIONER INGLEE:**  A letter

26  from the Reverend Andrew -

27      **INMATE SPRUELL:**  Andre.

49

1      PRESIDING COMMISSIONER INGLEE:  And-

2   excuse me, Andre Williams, and it says the

3   Pastor of New Birth Baptist Church in Los

4   Angeles, a nice support letter.  And you have a

5   letter from Mrs. Bennie Poole?

6      INMATE SPRUELL:  Bennie Ruth Poole,

7   that's my aunt.

8      PRESIDING COMMISSIONER INGLEE:

9   B-E-N-N-I-E P-O-O-L-E, and she lives where?

10      INMATE SPRUELL:  In Los Angeles.

11      PRESIDING COMMISSIONER INGLEE:  Los

12   Angeles?  By the way, you don't have to - you

13   don't have to go to the county in which you

14   previously lived, or where the crime was

15   committed.

16      INMATE SPRUELL:  Okay.

17      PRESIDING COMMISSIONER INGLEE:  But the

18   Commissioner who works with you, and it could be

19   me today, or somebody later on, they have to

20   feel that if you're going to go to a different

21   county, that it's in your best interest and the

22   best interest of the state that you go to a

23   different county for Parole.

24      INMATE SPRUELL:  Okay.

25      PRESIDING COMMISSIONER INGLEE:  So the

26   Commissioner can order you to that county.

27      INMATE SPRUELL:  Okay.

50

1       **PRESIDING COMMISSIONER INGLEE:** So, it's
2   not out of the realm of possibility that you
3   could go to another county for Parole.
4       **INMATE SPRUELL:** Okay.
5       **PRESIDING COMMISSIONER INGLEE:** Mrs. Poole
6   interjects God into this one -
7       **INMATE SPRUELL:** Yes, she's -
8       **PRESIDING COMMISSIONER INGLEE:** She must
9   be a rela- a very religious lady?
10      **INMATE SPRUELL:** Yes.
11      **PRESIDING COMMISSIONER INGLEE:** Says as
12  God is our guide, he has a place to live, very
13  nice. He would - he would be staying with me.
14  Again, addresses, in this case your launt- aunt
15  in fact signed it. Okay, now we get down to
16  your brother and I think this is the - this is
17  the letter which you are - which you really are
18  planning on, is that - your brother?
19      **INMATE SPRUELL:** Okay.
20      **PRESIDING COMMISSIONER INGLEE:** And this
21  is Thurman Dinkins, is he your half-brother?
22      **INMATE SPRUELL:** Yes.
23      **PRESIDING COMMISSIONER INGLEE:** Half-
24  brother. It says I extend my family's deepest
25  sympathy in regards to the victims and their
26  family, I am writing this letter of support on
27  behalf of my brother Vincent L. Spruell, he is

51

```
 1  found suitable and granted - if he is found

 2  suitable and granted for Parole date, my family

 3  and I will provide with a stable place of

 4  residence in addition to financial support for

 5  re-entrance to society.  I've been employed in

 6  the same place - what's the same place?

 7      INMATE SPRUELL:  Well he's been employed

 8  at Food 4 Less, he's a manager.

 9      PRESIDING COMMISSIONER INGLEE:  What kind

10  of manager is he?

11      ATTORNEY LEWIS:  What department?

12      INMATE SPRUELL:  In - fittin' to tell you

13  right now, he's in, I think he's in -

14      PRESIDING COMMISSIONER INGLEE:  Well let

15  me ask this, is he - he is in a management

16  position, is - does he work in a store itself -

17      INMATE SPRUELL:  Yes.

18      PRESIDING COMMISSIONER INGLEE:  Like he's

19  a manager of produce or something like that?

20      INMATE SPRUELL:  Produce, produce, yes.

21      PRESIDING COMMISSIONER INGLEE:  Okay.

22  But he's not - he's not like a Personnel

23  Manager?

24      INMATE SPRUELL:  No.

25      PRESIDING COMMISSIONER INGLEE:  It says

26  I've been employed for the same place, and we'll

27  accept the fact that it's Food 4 Less, for the
```

52

1    last nine or ten years where I am presently

2    employed as Manager of, here it is the Produce

3    Department I- if I had read a little bit longer,

4    I would have –

5         **INMATE SPRUELL:**  Okay.

6         **PRESIDING COMMISSIONER INGLEE:**  If Vince

7    is given a release date, I will provide him with

8    employment and encouragement he needs to

9    continue progress in our community.  Now, I read

10   back on a couple other hearings, and very

11   frankly to you, somebody should have told you

12   this before, because it isn't necessarily

13   something that would stop you from getting out,

14   but it is, your brother as the Manager of the

15   Produce Department, does not qualify to offer

16   you a job working for a large company,

17   Food 4 Less.  It doesn't mean you can't work

18   there, it means what he should be doing is

19   having a –

20        **DEPUTY COMMISSIONER MOORE:**  I'm sorry,

21   Commissioner –

22        **PRESIDING COMMISSIONER INGLEE:**  It's

23   okay.

24                   **(Off the Record)**

25        **DEPUTY COMMISSIONER MOORE:**  Back on the

26   record at 4:26 P.M.

27        **PRESIDING COMMISSIONER INGLEE:**  Let me

53

1   back up a little bit, your brother is offering

2   you a position, working for Food 4 Less –

3          **INMATE SPRUELL:**  Uh – huh?

4          **PRESIDING COMMISSIONER INGLEE:**  Yet, he

5   doesn't have the kind of position that normally,

6   in most large corporations, that would allow

7   them, allow him to hire you into that kind of

8   position.  Usually, most companies, would – you

9   would have to go through the Personnel

10  Department and they are the ones that would

11  generate a letter for you, for this regard.

12  Either a letter offering you a place to work, or

13  a letter offering you the opportunity to come

14  for an interview to a place to work.

15          **INMATE SPRUELL:**  Correct.

16          **PRESIDING COMMISSIONER INGLEE:**  In other

17  words, something that would leave the – the –

18  the Parole Board in a feeling that there is a

19  reasonable assumption you would have a place to

20  work or a fi– good opportunity for a place to

21  work.  So, if you don't get a date today, I keep

22  on saying that to you, but I want to be sure you

23  we– when you walk out of here today, you have no

24  questions whatsoever that the – that the grant

25  is not (indiscernible).  What you need to do is

26  have your brother get you a letter, from the

27  company, asking that and put it on letterhead

54

1   stationary.

2        **INMATE SPRUELL:**  Okay.

3        **PRESIDING COMMISSIONER INGLEE:**  There's

4   another issue, you're going to be a Convicted

5   Felon.  Smaller companies don't seem to have any

6   problem in this regard.  Larger companies

7   sometimes do and consequently, you don't want

8   assume that - that they're going to because of

9   what your brother said, they are going to hire

10  you.  It would be sad if you went all the way

11  through and then all of a sudden, because they

12  check the Investigators check all this stuff,

13  then find out that you don't have a job, you

14  have no way of getting a job so you're at - this

15  thing gets complicated enough, as it is -

16       **INMATE SPRUELL:**  Uh - huh.

17       **PRESIDING COMMISSIONER INGLEE:**  So you

18  really need to have something that's going to

19  leave the Parole Board, and in the case of when

20  the investigators do start looking at, they'll

21  know who to call to check on these things.

22  Okay?

23       **INMATE SPRUELL:**  Okay.

24       **PRESIDING COMMISSIONER INGLEE:**  All

25  right.  This has nothing to do with demeaning

26  your brother and I - as suggesting he doesn't

27  have the - it's just that when I read through

55

1  this, I couldn't get confidence that he had the

2  ability to hire a Convicted Felon into a

3  company, 'cause I think Food 4 Less is owned by

4  who, Vaughn's?

5      **INMATE SPRUELL:**  You have – you got me.

6      **PRESIDING COMMISSIONER INGLEE:**  I – I

7  think it may be owned by a larger grocery firm,

8  if I'm not mistaken, and generally they're

9  pretty – companies like this, I – I don't come

10  out of the grocery business but I come out of

11  corporate life and some pretty rigid rules in

12  this regard.  So, that's a recommendation.

13      **INMATE SPRUELL:**  Okay.

14      **PRESIDING COMMISSIONER INGLEE:**  All

15  right, are there any other letters that we may

16  have missed?

17      **ATTORNEY LEWIS:**  I think you have them

18  all.

19      **PRESIDING COMMISSIONER INGLEE:**  If there

20  are, please let me –

21      **INMATE SPRUELL:**  Did you get one from

22  Carlette Williams?  You should have it.

23  Carlette Williams.

24      **PRESIDING COMMISSIONER INGLEE:**  I have

25  the Reverend Williams.

26      **INMATE SPRUELL:**  No, Carlette, she's not

27  a Rever- I mean, Carlette Grant?

56

1          **ATTORNEY LEWIS:**  Pass it to the
2    Commissioner.
3          **PRESIDING COMMISSIONER INGLEE:**  No I
4    don't.
5          **ATTORNEY LEWIS:**  Okay.
6          **PRESIDING COMMISSIONER INGLEE:**  Give it
7    to the Correctional Officer.
8          **INMATE SPRUELL:**  I think that's the only
9    one you didn't have.
10         **PRESIDING COMMISSIONER INGLEE:**  Carlette
11   Grant, C-A-R-L-E-T-T-E, this your cousin?
12         **INMATE SPRUELL:**  Yes.
13         **PRESIDING COMMISSIONER INGLEE:**  It says
14   is her - her mother's a no nonsense person.
15         **INMATE SPRUELL:**  Yes.
16         **PRESIDING COMMISSIONER INGLEE:**  Sounds
17   like a - sounds like a strong family bac-
18   reference.  It's a excellent letter of support.
19   You want to hold on to it or do you want me to
20   put it in the file?
21         **INMATE SPRUELL:**  You can put it in the
22   file.
23         **PRESIDING COMMISSIONER INGLEE:**  Okay.
24   All right.  Let's go ahead and take a look at
25   your 3042 letters.  The prison sent out five.
26   These are letters that go out to the Courts and
27   Law Enforcement Agencies that dealt with your

57

1    incarceration, in fact I know they sent out five

2    and they were sent out on 4/14 of 2006.  We did

3    not receive any reference letters back on it,

4    however we do have a representative here from

5    the Merced County District Attorney's Office,

6    who will make a presentation in a few minutes.

7    Okay, with that, we'll go to post-conviction

8    factors, I'm sorry, no that's right, we are.

9    Okay.

10           **DEPUTY COMMISSIONER MOORE:**  And it's

11   Spru- Spruell?

12           **INMATE SPRUELL:**  Yes.

13           **DEPUTY COMMISSIONER MOORE:**  Mr. Spruell,

14   I want to pronounce it correctly.  Mr. Spruell,

15   I'm going to review with you specifically are

16   focusing on, since your last hearing in November

17   30th of '04, what you've done and completed as,

18   there will also be some references to some of

19   the things that you've done before that, as

20   well.  This is your sixth subsequent hearing.

21   Your last hearing was on November 30th, 2004, in

22   which you were denied parole for one year.  You

23   arrived here at CTF in Soledad in April of 1993?

24           **INMATE SPRUELL:**  Yes.

25           **DEPUTY COMMISSIONER MOORE:**  Okay.  Your

26   classification score is the lowest possible with

27   a life crime of 19, you achieved the lowest

58

1   possible score in February of '96.  Your custody

2   level is medium A, which you - you arrived at in

3   March of '91.  You are clear of any gang

4   affiliation while here in prison.  Your current

5   work assignment is in the Computer Repair area

6   and you have received nothing but exceptional

7   reviews since December of '99, straight across

8   the board.  Mr. Motherwell wrote your last

9   ratings report in March of 9- of '06 and you are

10  considered an exceptional worker.  You have a -

11  a 12.9 reading level.  I note that there's, I

12  don't see any certificates, but I do note that

13  you recei- you got both your High School Diploma

14  and a GED.

15          **INMATE SPRUELL:**  Correct.

16          **DEPUTY COMMISSIONER MOORE:**  And you got

17  both of those while you were in custody?

18          **INMATE SPRUELL:**  Yes.

19          **DEPUTY COMMISSIONER MOORE:**  Okay.  And

20  continuing on with the academics into your

21  programming, it appears that you're involved in

22  Independent Study Program through Coastline

23  Community College.

24          **INMATE SPRUELL:**  Correct.

25          **DEPUTY COMMISSIONER MOORE:**  How many

26  credits have you completed?

27          **INMATE SPRUELL:**  Nine.

59

```
 1          DEPUTY COMMISSIONER MOORE:  Okay,
 2   currently studying Biology?
 3          INMATE SPRUELL:  Yes, I just finished.
 4          DEPUTY COMMISSIONER MOORE:  And, took the
 5   exam?
 6          INMATE SPRUELL:  Yes.
 7          DEPUTY COMMISSIONER MOORE:  How'd you do?
 8          INMATE SPRUELL:  I'm waiting on the
 9   results now.
10          DEPUTY COMMISSIONER MOORE:  Okay.  What's
11   your next class going to be?
12          INMATE SPRUELL:  Geology.
13          DEPUTY COMMISSIONER MOORE:  Okay and what
14   are you shooting for, an AA or-
15          INMATE SPRUELL:  AA, yes.
16          DEPUTY COMMISSIONER MOORE:  Okay, in
17   what- in a specific area?
18          INMATE SPRUELL:  No, just general
19   education.
20          DEPUTY COMMISSIONER MOORE:  Okay, and
21   what do you want to do after you obtain your AA?
22          INMATE SPRUELL:  Well, con- I want to
23   continue on in computers.
24          DEPUTY COMMISSIONER MOORE:  In computer -
25          INMATE SPRUELL:  Yes.
26          DEPUTY COMMISSIONER MOORE:  Programming?
27   Soft-
```

60

 1       **INMATE SPRUELL:**  Tech- repair, repair,
 2   not programming, just repair.
 3       **DEPUTY COMMISSIONER MOORE:**  Okay.  You
 4   ha- you have vocational training that you have
 5   started and - and are currently work on is in
 6   Computer Repair and Refurbishing.
 7       **INMATE SPRUELL:**  Correct.
 8       **DEPUTY COMMISSIONER MOORE:**  Okay, and you
 9   were involved, at one time, in the program that
10   was repairing programs for schools -
11       **INMATE SPRUELL:**  Yes.
12       **DEPUTY COMMISSIONER MOORE:**  In
13   California.  That program shut down due to
14   budget cuts, no other issues except budget cuts.
15       **INMATE SPRUELL:**  Yes.                •
16       **DEPUTY COMMISSIONER MOORE:**  There's a
17   laudatory chrono in your file dated September of
18   '05 in which, when that program was sh- closed
19   down and you were very important in the packing
20   up of all of the computers, large numbers of
21   computers and materials and getting them shipped
22   to Sacramento so that the classroom could be
23   subsequently re-opened for other uses, I ⁻
24   believe, and Mr. Motherwell wrote that
25   particular laudatory chrono on your behalf and -
26   and indicated that you, once again, showed
27   initiative and excellent work.  While I'm on

61

1    laudatory chronos, I'll also indicate that I

2    found one dated February of '06 regarding your

3    participation and completion of an Anger

4    Management series on Healing the Angry Heart?

5    That was written by Judge Lindsey.

6         **INMATE SPRUELL:**  Yes.

7         **DEPUTY COMMISSIONER MOORE:**  Okay and it's

8    - it's indicated that it was a video series, can

9    you tell me a little bit more about that?

10        **INMATE SPRUELL:**  Well it was more, it was

11   - it was a video series re- surrounding religion

12   and how to deal with your problems and if you

13   have any other like anger problems you find the

14   root to where it started.  You know, and then if

15   you have any problems with that, then you go

16   outside that, outside yourself and get help, a

17   psychiatrist, and find out what your problem is.

18        **DEPUTY COMMISSIONER MOORE:**  Okay.  And

19   was there discussion involved with the video, or

20   was it strictly your seat time, and you're

21   watching a video?

22        **INMATE SPRUELL:**  No, it was discussion.

23        **DEPUTY COMMISSIONER MOORE:**  Okay and who

24   led the discussion?

25        **INMATE SPRUELL:**  The Pastor.

26        **DEPUTY COMMISSIONER MOORE:**  Okay and -

27   and this was a three hour investment of time?

62

1          INMATE SPRUELL:  Uh - huh.

2          DEPUTY COMMISSIONER MOORE:  Okay.  What

3     did you learn from it?

4          INMATE SPRUELL:  Well, it took me back to

5     a lot of things that I've a- I've already, I

6     grew up knowing as far as in, from the Church.

7     About dealing with my own issues and my - my own

8     anger, how to control my anger.

9          DEPUTY COMMISSIONER MOORE:  How?

10         INMATE SPRUELL:  Well, for one, by not

11    allowing myself to get emotionally involved in

12    certain negative things, you know, finding other

13    ways to deal with it.

14         DEPUTY COMMISSIONER MOORE:  Uh - huh.

15         INMATE SPRUELL:  You know, and that's

16    what the video was teaching us.

17         DEPUTY COMMISSIONER MOORE:  Okay.  Also

18    note that you did complete, prior to your last

19    hearing, but I thought it was important to note,

20    that you completed the Thirteen Week Impact

21    Workshop.

22         INMATE SPRUELL:  Yes.

23         DEPUTY COMMISSIONER MOORE:  And that has

24    been discontinued here, is that correct?

25         INMATE SPRUELL:  Yes, I believe so.

26         DEPUTY COMMISSIONER MOORE:  And what did

27    you get out of that workshop?

63

1          **INMATE SPRUELL:**  Well, we deal with more

2     or less the victim's side of crime.  People came

3     in, spokespeople came in that was victims and

4     they told us how it affected their lives and the

5     magnitude of all the other people's lives that

6     you affect when you commit a crime like this,

7     and that's what it taught me, that you know,

8     that it's just – it's not just about you, it's

9     about a whole lot of more people.

10         **DEPUTY COMMISSIONER MOORE:**  Now, I also

11    note that you've been attending AA since

12    probably prior to October of '04 –

13         **INMATE SPRUELL:**  Yes.

14         **DEPUTY COMMISSIONER MOORE:**  But

15    consistent attendance at AA.  Why do you go to

16    AA?

17         **INMATE SPRUELL:**  For self help.

18         **DEPUTY COMMISSIONER MOORE:**  Tell me why

19    do you go to AA?  Self help's what the Board

20    says, why do you go?

21         **INMATE SPRUELL:**  Well – well because it

22    keeps – it keeps me out of trouble, it keeps me

23    –

24         **DEPUTY COMMISSIONER MOORE:**  How?

25         **INMATE SPRUELL:**  It keeps me focused on

26    the bigger picture.

27         **DEPUTY COMMISSIONER MOORE:**  Tell me how

64

1   it keeps you out of trouble.

2       **INMATE SPRUELL:**  Well it's – it's a

3   program that I can attend to on a weekly basis,

4   you know it – it shows me that I can solve my

5   problems without having to have – have me drink

6   or alcohol, you know, and – and that's what it's

7   there for.

8       **DEPUTY COMMISSIONER MOORE:**  What else

9   have you gotten out of it?  What do you do at a

10  AA meeting?

11      **INMATE SPRUELL:**  Well we sit and discuss

12  different problems, different problems that

13  other- everybody else had that caused them to

14  drink and – and it helps.

15      **DEPUTY COMMISSIONER MOORE:**  Now, are you

16  an alcoholic?

17      **INMATE SPRUELL:**  No.

18      **DEPUTY COMMISSIONER MOORE:**  So, why did

19  you choose AA?

20      **INMATE SPRUELL:**  Well actually it was –

21  it was one of the only programs that was here.

22      **DEPUTY COMMISSIONER MOORE:**  Okay are

23  there any other programmings available to you at

24  this time?

25      **INMATE SPRUELL:**  No, not at this time,

26  no.

27      **DEPUTY COMMISSIONER MOORE:**  Are you in

65

 1  Central?

 2          **INMATE SPRUELL:**  Yes.

 3          **DEPUTY COMMISSIONER MOORE:**  Have you –

 4  have you sought to be on waiting lists for other

 5  programming which would require you to change

 6  your housing?

 7          **INMATE SPRUELL:**  Yes, but they don't let

 8  you transfer out right now so –

 9          **DEPUTY COMMISSIONER MOORE:**  Okay, are you

10  on any other waiting lists?

11          **INMATE SPRUELL:**  Yeah, outside Anger

12  Management with the Psychiatrist, but they say

13  you have to be Triple CMS to –

14          **DEPUTY COMMISSIONER MOORE:**  Any other,

15  are you on any waiting lists?

16          **INMATE SPRUELL:**  No, there's nothing else

17  here.

18          **DEPUTY COMMISSIONER MOORE:**  Okay.  Are

19  you involved in reading the literature, at all,

20  in AA?

21          **INMATE SPRUELL:**  Yes.

22          **DEPUTY COMMISSIONER MOORE:**  Tell me what

23  you've read –

24          **INMATE SPRUELL:**  We do the 12 Steps.

25          **DEPUTY COMMISSIONER MOORE:**  Okay, well

26  that's 12 Steps but there's a lot of other AA

27  literature.  Have you read any of it?

66

1        **INMATE SPRUELL:**  No.

2        **DEPUTY COMMISSIONER MOORE:**  Do you have a

3    copy of the book called Alcoholics Anonymous?

4        **INMATE SPRUELL:**  No.

5        **DEPUTY COMMISSIONER MOORE:**  Have you

6    heard anything in those meetings that attendance

7    alone isn't going to help you bring about

8    change?  That you have to do something more than

9    just show up at a meeting?

10       **INMATE SPRUELL:**   Well yeah, you - you

11   would have to apply the steps and - and - and

12   continue to live the steps.

13       **DEPUTY COMMISSIONER MOORE:**  How do you

14   learn about the steps?

15       **INMATE SPRUELL:**  Well through, you know,

16   through meeting different people and discussing

17   their problems with you and you - you find out

18   that they have some of the same similar problems

19   you have, it's just that they took a different

20   route.

21       **DEPUTY COMMISSIONER MOORE:**  Is there any

22   - do you ever involve any use of literature at

23   all in the meetings?

24       **INMATE SPRUELL:**  No.

25       **DEPUTY COMMISSIONER MOORE:**  Okay.  Moving

26   now to that's - so I've covered the Independent

27   Study Program, AA, I didn't want to cover the

67

1  Impact program 'cause it's a - it was a pretty
2  viable program at one time.  I'm gonna now move,
3  is there anything else in that area, laudatory
4  chronos or self help programming that I haven't
5  covered?  Does everything seem?

6      **INMATE SPRUELL:**  Yes.

7      **DEPUTY COMMISSIONER MOORE:**  Okay.  In
8  going to your disciplinary history, I note that
9  since you've been incarcerated, you've only
10  received two 115's.  The last one was in 1992
11  for delaying a yard recall.  There's no history,
12  well I don't want to say there's a history of
13  violence, in sighting disruptive behavior, which
14  started off as inciting a riot -

15      **INMATE SPRUELL:**  No.

16      **DEPUTY COMMISSIONER MOORE:**  It what, it
17  didn't start off as that?

18      **INMATE SPRUELL:**  No.

19      **DEPUTY COMMISSIONER MOORE:**  Okay, why
20  don't you tell me about it?

21      **INMATE SPRUELL:**  It started out, me and a
22  Officer having words and because there was other
23  inmates around, that's how I got sited with
24  disruptive behavior.

25      **DEPUTY COMMISSIONER MOORE:**  Okay and that
26  was in -

27      **INMATE SPRUELL:**  '92.

68

1        **DEPUTY COMMISSIONER MOORE:**  Okay.

2        **INMATE SPRUELL:**  Fourteen years ago, I

3   believe.

4        **DEPUTY COMMISSIONER MOORE:**  I did mistake

5   that, thank you for helping refresh my memory on

6   that.  So, two 115's and both of them in '92 at

7   Mule Creek.  One for delaying yard recall and

8   the other for inciting disruptive behavior.  The

9   - on the 128's, you have a total of nine, the

10  last one is fairly recent -

11       **INMATE SPRUELL:**  No.

12       **DEPUTY COMMISSIONER MOORE:**  July of '05?

13       **INMATE SPRUELL:**  There's a typo - there's

14  a typo on that, I believe, I think she corrected

15  it, the Counselor corrected it.

16       **DEPUTY COMMISSIONER MOORE:**  I'm looking

17  at July 17th, alleged walk-out.

18       **ATTORNEY LEWIS:**  It's incorrect, he's

19  showing me the correct one.  Mine has a typo

20  too.

21       **DEPUTY COMMISSIONER MOORE:**  Okay, I'm

22  looking at the actual chrono, dated 7/17/05.

23       **INMATE SPRUELL:**  That's a typo from-

24  that's from my Counselor right there.

25       **DEPUTY COMMISSIONER MOORE:**  I don't see a

26  correction of the 7/17/05 chrono, on this date

27  at approximately 7:30 in the morning, Inmate

69

1   Spruell, Spruell failed to lockup while the

2   normal lockup was being performed on his tier.

3   This action caused special unlocked perform to

4   lock Inmate Spruell in his cell.  His conduct is

5   disruptive to the normal operation of the wing,

6   and delaying the wing officers in the

7   performance of their duties.  Spruell has been

8   verbally counseled on 5/8/05 and 5/30 of '05,

9   concerning lockup procedures, as documented on

10  his bed card.  Spruell is aware of this report

11  and infirmed that – informed that further

12  violation of this nature may result in

13  progressive disciplinary documentation.

14      **INMATE SPRUELL:**  I'm not familiar with

15  that.

16      **DEPUTY COMMISSIONER MOORE:**  The one prior

17  to that is on June 9th of '91.  This report is

18  dated, that you handed me, is dated November of

19  '05 and it appears that this particular, I'm

20  gonna toss this back, okay?  Thank you, though,

21  Officer, I appreciate it.  Was placed in the

22  file, but it is not in the Board packet, is it

23  Counsel?

24      **ATTORNEY LEWIS:**  No, it's not.

25      **DEPUTY COMMISSIONER MOORE:**  I'd be happy

26  to, at the Commissioner's discretion to give you

27  an opportunity, I have read it, it signed by

70

1    C.O. Kropp, K-R-O-P-P, and I'd be happy to give

2    you an opportunity to take a look at it, if you

3    think that would be necessary.  And it indicates

4    there were two prior counselings in May,

5    regarding the same conduct and that in July is

6    when the write up occurred.

7        ATTORNEY LEWIS:  That won't be necessary,

8    Deputy Commissioner.

9        PRESIDING COMMISSIONER INGLEE:  Doesn't

10   your - your list of 128's, doesn't that -

11   doesn't it reference that in the bottom of 7/17?

12       ATTORNEY LEWIS:  Mine says '05, but he

13   has shown me that and so I've got to take it for

14   what it's -

15       INMATE SPRUELL:  Yeah, because I didn't

16   have it- I don't have it.

17       PRESIDING COMMISSIONER INGLEE:  You

18   recall them speaking to you about it?

19       INMATE SPRUELL:  Yes, I recall them

20   speaking to me about it, I don't have a 128 on

21   it.

22       PRESIDING COMMISSIONER INGLEE:  That's

23   all, I'm sorry, go ahead.

24       DEPUTY COMMISSIONER MOORE:  When is the

25   last time you reviewed your C-File?

26       INMATE SPRUELL:  In '05.

27       DEPUTY COMMISSIONER MOORE:  When?

71

1          INMATE SPRUELL:  With Counselor Rubio.

2          DEPUTY COMMISSIONER MOORE:  What day?

3          INMATE SPRUELL:  I think it was eight,

4    about - about the seventh, seventh month or

5    twenty-something, I forget what day it was.

6          DEPUTY COMMISSIONER MOORE:  July of '05?

7          INMATE SPRUELL:  Yes.

8          DEPUTY COMMISSIONER MOORE:  And this was

9    written up, the date of this is 7/17, you didn't

10   have an opp- you didn't take the opportunity to

11   review your C-File again, prior to this hearing?

12         INMATE SPRUELL:  No.

13         DEPUTY COMMISSIONER MOORE:  Okay.  Were

14   you provided an opportunity as such?

15         DEPUTY COMMISSIONER MOORE:  No, not that

16   I seen it the first time, no.

17         DEPUTY COMMISSIONER MOORE:  No Olsen

18   review?

19         INMATE SPRUELL:  That - that was my olsen

20   review.

21         DEPUTY COMMISSIONER MOORE:  Way back in

22   July of '05?

23         INMATE SPRUELL:  Yes.

24         DEPUTY COMMISSIONER MOORE:  Okay.  Well,

25   it does exist.

26         INMATE SPRUELL:  Okay.

27         DEPUTY COMMISSIONER MOORE:  It's wr- it's

72

1   written up and it's also on the disciplinary
2   cover sheet in your C-File so that will be
3   important for you to note in the future, when
4   you do your olsen review. I believe it - that's
5   the conclusion of that portion, we're gonna move
6   now, to the psychiatric, psychological
7   evaluation dated September of '04. This report
8   appears to have been written, authored by
9   Dr. Sexton, S-E-X-T-O-N, Consulting Psychologist
10  and Dr. Zika, Z-I-K-A, Senior Supervising
11  Psychologist, both of CTF, Soledad. The date of
12  the report is September 23rd of '04 and they
13  indicate, this is the fifth updated
14  psychological evaluation and they conducted an
15  interview, and it lasted about 90 minutes in
16  September of '04. Do you recall that?

17          **INMATE SPRUELL:** Yes.

18          **DEPUTY COMMISSIONER MOORE:** Okay. They
19  also reviewed all of the records. They
20  indicated that you appear to have accepted
21  complete responsibility for your inappropriate
22  behavior. I may have a question for you,
23  regarding that, after I'm done reviewing this.
24  And that you appear genuinely remorseful for
25  your behavior in resulting death. Your
26  understanding of the circumstances which led to
27  the offense, how to avoid them was excellent and

73

1    your judgment has vastly improved over the last

2    21 years.  They indicate that you are extremely

3    well trained in vocational areas and have

4    several certificates of completion.  I wanted to

5    ask you about that, what other certificates do

6    you have?  Just if you could, you don't have to

7    show them to me, just tell me, outside of the

8    computer refurbishing.

9            **INMATE SPRUELL:**  Information Technology,

10   Body and Fender, and other educational, self

11   help educational programs.

12           **DEPUTY COMMISSIONER MOORE:**  Okay, thank

13   you.  You continue to seek treating and self

14   motivated to improve.  Reviewing the C-File,

15   they indicate, they felt that no additional self

16   help programs can be recommended at this time.

17   Now obvious statements by the doctors were, it

18   is obvious from my interaction with the Inmate

19   that he is a civilized member of society, that

20   is ready for Parole.  They further go on to say

21   that it is clear you do not suffer from any mood

22   or psychotic disorders.  Under current

23   diagnostic impressions, they find none that

24   exist cur- as of September of '04.  They looked

25   specifically at your violence potential in a

26   free community, whether you've explored your

27   commitment offense and come to terms with the

74

1   underlying causes and to - also to explore and

2   develop insight as to why you had a weapon and

3   shot the victim, and all the events leading up

4   to the crime.  With regard to your vio- violence

5   potential in a free community, they comment, the

6   doctors comment that one you'd only look at your

7   behavior in institution setting as a precursor

8   to your community adjustment.  That you had not

9   received a 115 in over 12 years and had only

10   received two, in total, and then they moved on

11   to, they comment, in conclusion that the Inmate

12   has only received 115 of only minor consequence

13   in your 21 years, as of '04.  As one of the

14   115's, they assessed had been reduced to an

15   Administrative Charge.  As a result of the - of

16   these factors, they indicate, the doctors

17   indicate that your violence potential within a

18   controlled setting is estimated at significantly

19   below average, relative to this level to inmate

20   population.  Combining the above factors, with

21   the fact that you've never been involved with

22   drug or alcohol, your - the factors leading up

23   to violence in the community would be no greater

24   than any other citizen and the doctor then goes

25   on to say with his 32 years of expertise, nine

26   as a Parole Psychologist, that this Inmate poses

27   less threat in the community then the average

75

1   citizen currently in the community, and no more
2   of a threat than the average citizen. You have
3   excellent insight as to why you had a weapon and
4   what transpired leading to the death of the
5   individual. Your judgment and maturity, at
6   present, has been well documented in previous
7   psychiatric reports. It is clear that you are a
8   much different man today, than the 19-year old
9   who committed the offense. Considering all of
10  the above, my conclusions are those as reached
11  by the CC1, in 2004, considering the commitment
12  offense, prior record and prior prison
13  adjustment, this writer believes that the Inmate
14  would probably pose a low degree of threat to
15  the public at the time - at this time if
16  released from prison. You had previous psych-
17  psychological reports in 2003 and also in '98.
18  And then going, since the reference was made to
19  the prior reports, the assessment has been that
20  since '98, you're be no - potential for violence
21  would be no more than the average, relative,
22  average - I'm sorry, no more than average
23  relative to the average citizen. Very limited
24  reports in '90 and in '96. That's a conclusion
25  of my review of the psych- psychological
26  evaluations, is there anything you'd like to add
27  that I may have overlooked? Okay, Commissioner?

76

1        **PRESIDING COMMISSIONER INGLEE:**  I just

2    have a question concerning they – they indicate

3    there was no alcohol or drug problems?  I

4    believe, if I'm not mistaken, I believe the it

5    says in your under your social it says Spruell

6    stated that he drank alcohol and used marijuana.

7    Did you, in fact, say that?

8        **INMATE SPRUELL:**  Yes, I told them I've

9    tried marijuana and – and beer yes, I did tell

10   them that.  I didn't have a problem, you know

11   'cause I didn't like the way it tasted.

12       **PRESIDING COMMISSIONER INGLEE:**  Does it

13   come on the effect that the Inmate has never

14   done a – a drug or alcohol abuser.  The word

15   abuser may be the key issue on this thing, but

16   you did use alcohol and you did use marijuana?

17       **INMATE SPRUELL:**  Yes Sir, yes I've tried

18   it, yes.

19       **PRESIDING COMMISSIONER INGLEE:**  Okay.  I

20   have no questions that I – we were talking about

21   AA, and I want to give you a copy, would you

22   give this to the?  This is a – I gave this one,

23   people's are talking about if they have any

24   questions, it is the 12 Steps.  You may already

25   have a copy of that but if not, just add that to

26   your repertoire.  All right, I have no

27   questions.

77

1       **DEPUTY COMMISSIONER MOORE:**  I have a
2   couple, I want to, I haven't heard yet, what you
3   understand to be your part.  What did you do, or
4   to - to that this murder happened?  What is it
5   that happened here?  I know you shot a gun, but
6   what was going on?
7       **INMATE SPRUELL:**  Well, Turner, Michael
8   Turner, Derrel Turner, these are all my
9   relatives.
10      **DEPUTY COMMISSIONER MOORE:**  Cousins,
11  right?
12      **INMATE SPRUELL:**  Cousins, yes.  And
13  because they're my cousins, I felt just as
14  compelled to protect them as myself.  Now I
15  admit I was wrong.
16      **DEPUTY COMMISSIONER MOORE:**  Wrong for
17  what?
18      **INMATE SPRUELL:**  For even having an
19  illegal gun, for shooting a gun, and I'm deeply
20  sorry for the pain that I caused his family.  I
21  can never undo what I done.
22      **DEPUTY COMMISSIONER MOORE:**  Okay.
23      **INMATE SPRUELL:**  And I'm sorry for that.
24  But I must live with that, that's a burden that
25  I must live with and for that I'm deeply sorry.
26      **DEPUTY COMMISSIONER MOORE:**  I still want
27  to know about the causes.  You had a gun, it was

78

1   family, tell me what you know about all of

2   those, those are facts.  What is in you that was

3   being driven to do this?  To – to – to carry the

4   gun, to show up, to hang with your cousins, who

5   have been having a history of problems with

6   Trevino and Lopez and Gloria and there was

7   another gentleman, I can't remember his name.

8        **INMATE SPRUELL:**  Well, prior – prior to

9   me starting to hang with my cousins, Michael

10  Turner and Derrel Turner now, prior to that, we

11  each have had a limited association.  I mean, we

12  seen each other because we was family, but we

13  never really hung out with one another up until

14  that last couple- those last couple weeks at the

15  Fair.  After being having a gun pulled on me, I

16  started carrying the 22 pistol.  I should have

17  turned it in, I know.  But, prior to that, our

18  association was very limited, you know, we seen

19  each other, we hung with each other, then we go

20  our own separate ways.  Outside Michael because

21  he was o- my cousin, he participated in the

22  Merced V.I.P. Playboys with me and outside that,

23  that was the only time that night was for us to

24  even kick it – hang out.

25       **DEPUTY COMMISSIONER MOORE:**  You used to

26  be- you used to use the word kick it, didn't

27  you?

79

1        INMATE SPRUELL:  Yes I did.

2        DEPUTY COMMISSIONER MOORE:  Did Michael

3   testify at your trial?

4        INMATE SPRUELL:  Yes, I believe he did.

5        DEPUTY COMMISSIONER MOORE:  Well that's -

6   you believe he did, or he did?

7        INMATE SPRUELL:  Yes he did, yeah he got

8   on the stand, yes.

9        DEPUTY COMMISSIONER MOORE:  How about

10  Wyatt?

11       INMATE SPRUELL:  No.

12       DEPUTY COMMISSIONER MOORE:  How come?

13       INMATE SPRUELL:  Because he wasn't there,

14  he wasn't there that night.

15       DEPUTY COMMISSIONER MOORE:  Tyrone?

16       INMATE SPRUELL:  No, he wasn't there that

17  night.

18       DEPUTY COMMISSIONER MOORE:  Well who was

19  in the car, when you jumped in the Continental?

20       INMATE SPRUELL:  John Davis -

21       DEPUTY COMMISSIONER MOORE:  Uh - huh.

22       INMATE SPRUELL:  Derrel High -

23       DEPUTY COMMISSIONER MOORE:  Uh - huh.

24       INMATE SPRUELL:  Michael Turner and

25  myself.

26       DEPUTY COMMISSIONER MOORE:  And did those

27  three men testify at your trial?

80

1      **INMATE SPRUELL:** John Davis, Michael
2   Turner and Derrel High, yes they did.
3      **DEPUTY COMMISSIONER MOORE:** And no one
4   said anything about the second gun?
5      **INMATE SPRUELL:** No.
6      **DEPUTY COMMISSIONER MOORE:** And there
7   were more shots fired after Tyrone went down?
8      **INMATE SPRUELL:** After Tyrone went down?
9      **DEPUTY COMMISSIONER MOORE:** I'm sorry,
10  not Tyrone, Trevino went down?
11     **INMATE SPRUELL:** Yeah, after the car was
12  - after the car was leaving, yes.
13     **DEPUTY COMMISSIONER MOORE:** And where
14  were they coming from?
15     **INMATE SPRUELL:** They was coming outside
16  the car.
17     **DEPUTY COMMISSIONER MOORE:** Was the - did
18  the car have any bullet holes in it?
19     **INMATE SPRUELL:** No.
20     **PRESIDING COMMISSIONER INGLEE:** I'm
21  sorry, did you say it came from outside of the
22  car?
23     **INMATE SPRUELL:** Yes.
24     **PRESIDING COMMISSIONER INGLEE:** Didn't
25  the police find casings?
26     **INMATE SPRUELL:** Yes.
27     **PRESIDING COMMISSIONER INGLEE:** Inside

81

1   the car?

2        **INMATE SPRUELL:**  I believe - I believe

3   they said they found one casing inside the car.

4        **PRESIDING COMMISSIONER INGLEE:**  Okay, I

5   didn't mean to interrupt you but I, okay.

6        **DEPUTY COMMISSIONER MOORE:**  So, there

7   were no casings flying out of your gun?

8        **INMATE SPRUELL:**  No.

9        **DEPUTY COMMISSIONER MOORE:**  And the other

10  gun was a semi-automatic?

11       **INMATE SPRUELL:**  Yes.

12       **DEPUTY COMMISSIONER MOORE:**  And how do

13  you -

14       **INMATE SPRUELL:**  It was a 25.

15       **DEPUTY COMMISSIONER MOORE:**  How do you

16  know that?

17       **INMATE SPRUELL:**  Because of the Police

18  Reports.

19       **DEPUTY COMMISSIONER MOORE:**  And there

20  were no bullet holes in the Lincoln?

21       **INMATE SPRUELL:**  No.

22       **DEPUTY COMMISSIONER MOORE:**  As a matter

23  of fact, the Lincoln didn't belong to Mr. Turner

24  did it?

25       **INMATE SPRUELL:**  No, it - it belonged to

26  his girlfriend's father.

27       **DEPUTY COMMISSIONER MOORE:**  And the only

82

1   report that Michael made was what?

2          INMATE SPRUELL:   That somebody attacked

3   the car.

4          DEPUTY COMMISSIONER MOORE:   Right.  He

5   didn't say anything about the shooting?

6          INMATE SPRUELL:   No.

7          DEPUTY COMMISSIONER MOORE:   Help me

8   understand today, why I shouldn't have a feeling

9   that your sitting here continuing to protect

10  Michael Turner and the two other men in your

11  car.

12          INMATE SPRUELL:   Well, if you want – if

13  you want the truth, I don't know if they had a

14  gun.  I'm not trying to protect them because,

15  believe me, after going through what I've been

16  through in prison, doing all this time in

17  prison, I wouldn't want to sit here and protect

18  nobody and I'm the only one doing time.  I don't

19  believe that.

20          DEPUTY COMMISSIONER MOORE:   Well how do

21  you – how have you come to understand and

22  explain the 25 caliber casing that you escaped

23  with Michael Turner and the other two men?

24          INMATE SPRUELL:   I couldn't explain how

25  it got in there.

26          DEPUTY COMMISSIONER MOORE:   So,

27  hindsight, you know Monday – Monday – Monday

83

1  morning quarterback's very easy to do but what -

2  what is it that you should have done, could have

3  done differently in this whole deal?

4      INMATE SPRUELL:  I could have - I could

5  have reported this whole situation to the

6  authorities.

7      DEPUTY COMMISSIONER MOORE:  Well, that

8  wasn't gonna happen if Lopez had a knife, what

9  else could you have done?

10     INMATE SPRUELL:  'Cause you said with

11  hindsight, I mean with hindsight I can go back

12  farther than that and saying, once I found a gun

13  then I could have just turned it in, you know?

14  That's - that's the whole idea of hindsight.

15     DEPUTY COMMISSIONER MOORE:  Uh - huh.

16     INMATE SPRUELL:  And yes, I could have

17  reported to the District Attorney's Office, I

18  kept pursuing issue to the Police Department.

19     DEPUTY COMMISSIONER MOORE:  Why didn't

20  you?

21     INMATE SPRUELL:  Because I was young and

22  immature.

23     DEPUTY COMMISSIONER MOORE:  And that's

24  just not what you did.

25     INMATE SPRUELL:  Correct.

26     DEPUTY COMMISSIONER MOORE:  Violence was

27  escalating between you - with you and your

84

1   cousins and this group of - of men, Trevino's

2   group, Lopez's group.  Hard looks, fist fights,

3   more hard looks, maybe someone pointing a gun at

4   someone, maybe someone having a knife, so the

5   point where you armed yourself with a knife, is

6   that a fair description of what was going on?

7           **INMATE SPRUELL:**  Yes.

8           **DEPUTY COMMISSIONER MOORE:**  And this was

9   over how many months?

10          **INMATE SPRUELL:**  No, not months, just

11  (indiscernible) of a couple weeks.

12          **DEPUTY COMMISSIONER MOORE:**  Okay.  After

13  you shot Lopez, did he start running?

14          **INMATE SPRUELL:**  Did I start running?

15          **DEPUTY COMMISSIONER MOORE:**  Did he start

16  running?

17          **INMATE SPRUELL:**  No.

18          **DEPUTY COMMISSIONER MOORE:**  What did he

19  do after you shot him?

20          **INMATE SPRUELL:**  Well he grabbed, I think

21  he grabbed Frank, or Frank grabbed him but by

22  that time, I was behind the car so.  I was

23  trying to get out of the way of the - hearing

24  the gunshots.

25          **DEPUTY COMMISSIONER MOORE:**  But you fired

26  a second time too.

27          **INMATE SPRUELL:**  But that was - but that

1  was before Frank came.

2      **DEPUTY COMMISSIONER MOORE:**  That's all I

3  have.

4      **PRESIDING COMMISSIONER INGLEE:**  Okay.

5  District Attorney, questions?

6      **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

7  Yeah, so it's still really self defense is what

8  you're saying, you were defending yourself

9  because this man had a knife?

10      **INMATE SPRUELL:**  Yes.

11      **PRESIDING COMMISSIONER INGLEE:**  And

12  you're speaking to us, now.

13      **INMATE SPRUELL:**  Yes.

14      **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

15  Yeah, is it permissible that I just ask him

16  questions directly, sometimes -

17      **PRESIDING COMMISSIONER INGLEE:**  I tell

18  you, just pose the questions to me -

19      **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

20  Okay, that's fine.

21      **PRESIDING COMMISSIONER INGLEE:**  And if it

22  seems reasonable and it's - it's simple enough,

23  I will just ask him to answer the questions.

24      **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

25  Yeah.  The report talks about you having

26  excellent insight as to why you had a weapon and

27  you've previously been convicted or adjudicated

86

1  of a 242, so you knew you couldn't have a

2  firearm at all.  Is that right, or not?

3       **PRESIDING COMMISSIONER INGLEE:**  Did you

4  know that?  That you're unable to carry a

5  firearm?

6       **INMATE SPRUELL:**  No, I didn't know that.

7       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

8  Okay.  And it was concealed.

9       **PRESIDING COMMISSIONER INGLEE:**  It's a

10  concealed weapon?

11       **INMATE SPRUELL:**  Yes.

12       **PRESIDING COMMISSIONER INGLEE:**  In a bag,

13  as I recall.

14       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

15  And you knew that was wrong, didn't you?

16       **INMATE SPRUELL:**  Correct.

17       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

18  And the, Mr. Lopez had pulled a gun on you a

19  couple weeks before, at the Fair?  Am I correct

20  on that?

21       **PRESIDING COMMISSIONER INGLEE:**  Did he

22  pull a gun on you before?

23       **INMATE SPRUELL:**  Yes.

24       **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**

25  And after that, you found the gun in the - in

26  the parking lot?

27       **INMATE SPRUELL:**  Well I found the gun a

87

1   week before.

2        **DEPUTY DEPUTY DISTRICT ATTORNEY COOKE:**   A

3   week before the othe- the man pulled a gun on

4   you?

5        **INMATE SPRUELL:**   Yes.

6        **DEPUTY DISTRICT ATTORNEY COOKE:**   And the

7   gun happened to be loaded?

8        **PRESIDING COMMISSIONER INGLEE:**   Was the

9   gun loaded?

10       **INMATE SPRUELL:**   Yes.

11       **PRESIDING COMMISSIONER INGLEE:**   And there

12   rounds already out of it?

13       **INMATE SPRUELL:**   Yes, and with extra

14   shells that was in the bag 'cause I found it in

15   a bag, a brown paper bag.

16       **PRESIDING COMMISSIONER INGLEE:**   Let me

17   just expand on what you, 'cause I didn't, I

18   didn't realize this.  So, the bag that you took

19   the weapon out of to shoot these two men, is the

20   same bag you found the pistol in?

21       **INMATE SPRUELL:**   No.

22       **PRESIDING COMMISSIONER INGLEE:**   A

23   different bag?

24       **INMATE SPRUELL:**   Yes.

25       **PRESIDING COMMISSIONER INGLEE:**   So you

26   found that pistol in –

27       **INMATE SPRUELL:**   In a brown paper bag.

88

1        **PRESIDING COMMISSIONER INGLEE:**   With

2   rounds?

3        **INMATE SPRUELL:**   Yes.

4        **PRESIDING COMMISSIONER INGLEE:**   And it

5   was a revolver?

6        **INMATE SPRUELL:**   Yes.

7        **PRESIDING COMMISSIONER INGLEE:**   All

8   right.

9        **DEPUTY DISTRICT ATTORNEY COOKE:**   Okay and

10   - and as I understand it, you don't have a

11   drinking or alcohol problem at all?

12        **PRESIDING COMMISSIONER INGLEE:**   You have

13   no drinking or alcohol problems?

14        **INMATE SPRUELL:**   No.

15        **DEPUTY DISTRICT ATTORNEY COOKE:**   But

16   you're gonna go - you're going to AA?

17        **INMATE SPRUELL:**   Yes.

18        **DEPUTY DISTRICT ATTORNEY COOKE:**   Do they

19   have an Allen on here, or something like that?

20        **INMATE SPRUELL:**   nope.

21        **PRESIDING COMMISSIONER INGLEE:**   Allen is

22   the support for AA.

23        **DEPUTY DISTRICT ATTORNEY COOKE:**   For

24   people, do you have members of your family that

25   have alcohol problems?

26        **PRESIDING COMMISSIONER INGLEE:**   Do you

27   have members of your family that have alcohol

89

1   problems?

2          INMATE SPRUELL:  No.

3          DEPUTY DISTRICT ATTORNEY COOKE:  And, at

4   the trial Mr. Lopez testified that he was

5   leaving and Mr. Trevino was hel- helping him to

6   leave the fight when Mr. Trevino was shot, is

7   that - is that your recollection?

8          PRESIDING COMMISSIONER INGLEE:  Your

9   recollection was that Mr. Lopez, Mr. Trevino was

10  helping Mr. Lopez leave, after Mr. Lope- after

11  you had shot Mr. Lopez?

12         INMATE SPRUELL:  You got me confused with

13  that one.

14         PRESIDING COMMISSIONER INGLEE:  Mr. Lopez

15  was shot -

16         INMATE SPRUELL:  Yes.

17         PRESIDING COMMISSIONER INGLEE:  Mr.

18  Trevino came back to help him leave -

19         INMATE SPRUELL:  Okay.

20         PRESIDING COMMISSIONER INGLEE:  And then

21  Mr. Trevino was shot?

22         INMATE SPRUELL:  Yes.

23         DEPUTY DISTRICT ATTORNEY COOKE:  And you

24  remember that?

25         INMATE SPRUELL:  Yes.

26         DEPUTY DISTRICT ATTORNEY COOKE:  They

27  were leaving the fight, weren't they?

90

1          **INMATE SPRUELL:**  Well no, actually –
2          **PRESIDING COMMISSIONER INGLEE:**  I know
3    it's hard but speak, just speak to me, that's
4    fine.  They were leaving the fight, he was
5    actually taking Mr., Mr. Trevino, from what I've
6    read here, was taking Mr. Tr- Mr. Lopez out of
7    the fight area at that point?
8          **INMATE SPRUELL:**  No.
9          **PRESIDING COMMISSIONER INGLEE:**  Were they
10   attacking you?
11         **INMATE SPRUELL:**  No they – they were
12   standing right there and then Frank fell over.
13   They never got in pursuit to leave no where.
14         **DEPUTY DISTRICT ATTORNEY COOKE:**  And was
15   it true that after Mr. Trevino went down that
16   you were firing, continuing to fire shots?  Is
17   that true?
18         **PRESIDING COMMISSIONER INGLEE:**  Once Mr.
19   Trevino was down, for whatever reason, you
20   continued to shoot your weapon?
21         **INMATE SPRUELL:**  No.
22         **DEPUTY DISTRICT ATTORNEY COOKE:**  And is –
23   and you deny that there were any shots fired
24   from the vehicle as you were leaving the scene?
25         **PRESIDING COMMISSIONER INGLEE:**  You don't
26   recall any fire, gunfire coming from the vehicle
27   as you were driving away?

91

1      **INMATE SPRUELL:**  There was no shots fired

2  from the vehicle as we was leaving.

3      **DEPUTY DISTRICT ATTORNEY COOKE:**  And did

4  you go to the hospital for the scratch on your

5  ribcage?

6      **PRESIDING COMMISSIONER INGLEE:**  Did you

7  go to the - the hospital or doctor's to take

8  care of the scratch on your ribcage?

9      **INMATE SPRUELL:**  No.

10      **DEPUTY DISTRICT ATTORNEY COOKE:**  And if -

11  if there were shots coming from the car, as it

12  was leaving that you were in, you would have

13  seen and heard them wouldn't you?  You would

14  have seen people firing?

15      **PRESIDING COMMISSIONER INGLEE:**  If there

16  had been shots from the car that you were in -

17      **INMATE SPRUELL:**  Yes.

18      **PRESIDING COMMISSIONER INGLEE:**  You - you

19  would have either seen it or at least heard it?

20      **INMATE SPRUELL:**  Yes.

21      **DEPUTY DISTRICT ATTORNEY COOKE:**  And -

22  and you didn't see anyone with a gun in the car?

23      **PRESIDING COMMISSIONER INGLEE:**  Did you

24  not see anybody with a gun in the car?

25      **INMATE SPRUELL:**  No.

26      **DEPUTY DISTRICT ATTORNEY COOKE:**  And you

27  didn't hear any gunshots coming from the car as

92

1   you were leaving the scene?

2          **PRESIDING COMMISSIONER INGLEE:**   And no

3   gunshot fire, and you didn't hear any gunshot

4   fire in from the car?

5          **INMATE SPRUELL:**   Correct, no.

6          **DEPUTY DISTRICT ATTORNEY COOKE:**   And it's

7   true, isn't it, that Wyatt, your cousin, stabbed

8   Carlos and Tommy Gutierrez, the leaders of these

9   other group of young men, sometime before and

10  that's how the rivalry between that group and

11  your group started, isn't it?

12         **INMATE SPRUELL:**   Well I - I don't know

13  nothing about Wyatt stabbing the gentlemen you

14  spoke of, so -

15         **PRESIDING COMMISSIONER INGLEE:**   He's

16  saying is your - your cousin, apparently, at

17  least from his perspective, he understands that

18  they - he, your cousin stabbed two of these men,

19  these two Latino men?

20         **INMATE SPRUELL:**   Okay, first -

21         **PRESIDING COMMISSIONER INGLEE:**   You don't

22  - you don't recall that?

23         **INMATE SPRUELL:**   First, Wyatt isn't

24  related to me.  Wyatt's not my cousin.

25         **PRESIDING COMMISSIONER INGLEE:**   Okay.

26         **DEPUTY DISTRICT ATTORNEY COOKE:**   Okay.

27         **INMATE SPRUELL:**   Secondly, yes I think

93

1   they did stem from that.

2          PRESIDING COMMISSIONER INGLEE:  So the

3   statement is true, except he's not your cousin?

4          INMATE SPRUELL:  Correct.

5          DEPUTY DISTRICT ATTORNEY COOKE:  I'm

6   sorry, well I - I retract that, then.  And how

7   long before the night of the Mr. Trevino was

8   killed was it that Wyatt apparently had stabbed

9   these other people?

10         PRESIDING COMMISSIONER INGLEE:  You know

11  how long a period of time it was between the

12  time he stabbed and then the night of the

13  firing?

14         INMATE SPRUELL:  No.  I don't -

15         PRESIDING COMMISSIONER INGLEE:  Estimate.

16         INMATE SPRUELL:  I don't know.  I don't

17  know.

18         PRESIDING COMMISSIONER INGLEE:  You just

19  don't know, okay.

20         DEPUTY DISTRICT ATTORNEY COOKE:  When you

21  - that's - I don't have any further questions,

22  thank you.

23         PRESIDING COMMISSIONER INGLEE:  Counsel,

24  questions?

25         ATTORNEY LEWIS:  I don't have questions,

26  I have a summary.

27         PRESIDING COMMISSIONER INGLEE:  Oh we'll

94

1    have the summary, but I - I want to give -

2            **ATTORNEY LEWIS:**  I have no questions.

3            **PRESIDING COMMISSIONER INGLEE:**  My

4    client's, my couns, Deputy Commissioner, if she

5    has any other questions?

6            **DEPUTY COMMISSIONER MOORE:**  How did you

7    get the nickname Papa?

8            **INMATE SPRUELL:**  I had it ever since I

9    was a kid.  Child, I think one of my uncles gave

10   it to me when I was a child or something like

11   that.

12           **DEPUTY COMMISSIONER MOORE:**  Thanks.

13           **PRESIDING COMMISSIONER INGLEE:**  That's

14   not a gang term?

15           **INMATE SPRUELL:**  No.

16           **PRESIDING COMMISSIONER INGLEE:**  All

17   right, summary, District Attorney.

18           **DEPUTY DISTRICT ATTORNEY COOKE:**  Well, I

19   think the facts of the case are pretty - pretty

20   grim, I would submit that is a pretty callous

21   and brutal crime that took place here.  There

22   were two victims, one was shot in the shoulder

23   and the other was shot in the head and shot in

24   the wrist.  The, Mr. Spruell has a history of

25   ward ship and a number of - a number of

26   adjudications and - and those of course have

27   increasing seriousness.  He took the time to arm

95

1   himself with a firearm, he - he knew that

2   there'd been problems with one of the victims

3   before and he just happened to find a firearm in

4   a brown bag with some extra ammunition and had

5   it with him for protection and low and behold

6   just happened to shoot the person, who a few

7   weeks before had pulled a gun on him.  If he

8   denies that this a gang, but if you look at the

9   Probation Report, you can see that the

10  references to the gang, street gang, the

11  Playboys and if you read the Probation Report

12  when Mr. Lopez, the survivor, talks he talks

13  about his homeys taking revenge on these people

14  when he first talks to the Police.  So it's

15  clear that this has gang connotations written

16  all over it.  I - I would submit he has a

17  profound lack of insight into - into his

18  participation here.  He continues to claim that

19  this is self defense.  I'd submit that here we

20  have he and others in a car that had gone to

21  Byrite and then when they leave, they're still

22  shooting and they're shooting at people they'd

23  been feuding with and he's verified it for us

24  and that is included in the legal papers that

25  one of the people he was associated with had

26  stabbed Tommy Gutierrez, among others, who is a

27  leader of the other group.  I would comment that

1   he's had a recent disciplinary action in July of
2   last year.  I'd point out that the psychiatric
3   report would suggest that he is no more a threat
4   than the average citizen, I don't understand how
5   they get there.  They go in 1998 from a person
6   with an anti-social personality disorder to no
7   contributory clinical disorder within a period
8   of three years and – and they continue to, and
9   they also say he's less a threat to the
10  community then the average parolee currently in
11  the community.  Am I to take that based on his
12  history and are we to consider, based on his
13  history that the average thief who's in custody
14  and who has no violence in his past, you know he
15  hasn't murdered anybody or shot anyone else, is
16  that person to be considered more dangerous that
17  Mr. Spruell?  I – if you look at his history, we
18  can only conclude that that just doesn't make
19  any sense.  And - and further, I don't
20  understand how they conclude that he would not
21  be more of a threat than the average citizen.
22  The average citizen, assuming he has no criminal
23  history, you know, and who is law abiding.
24  couldn't, it's not a comparable sect, they're
25  different sects.  This is a man with prior
26  criminal history of violence and so I don't
27  understand how the most recent of psychiatric

97

1   reports can come to the conclusions that they do

2   and they also points out it has excellent

3   insight into why he had a weapon.  Well, I - I

4   guess if you mean by insight he had a weapon

5   because he wanted to protect himself, but the

6   fact is and I would submit that the evidence, if

7   you look at the legal reports and what he's said

8   here today, indicates he was with one group of

9   men who had a feud with another -

10                    **(Off the Record)**

11       **DEPUTY COMMISSIONER MOORE:**  We're back on

12   the record on Tape 2 at 5:23.

13       **DEPUTY DISTRICT ATTORNEY COOKE:**  Yes, the

14   fact is that this - this one group of men that

15   Mr. Spruell belonged to had a ongoing

16   confrontation with another group of young men

17   and that he armed himself and when there was a

18   confrontation, he participated and murdered one

19   of them and - and the shooting of a - and

20   wounding another one who spent four days in the

21   hospital.  Given all these factors, I would

22   submit that Mr. Spruell lacks real insight and

23   really is not accepting of his responsibility

24   for what he's done here and there's really not a

25   suitable candidate for parole that would pose an

26   unreasonable risk of danger if he's released

27   into the community.  Thank you.

98

1        **PRESIDING COMMISSIONER INGLEE:** All right
2    thank you very much, Counsel (indiscernible)?
3        **ATTORNEY LEWIS:** The historical Hadfields
4    and the McCoys were two groups of people who
5    were feuding, were they gangs? My c- my
6    client's life crime is one of self defense, self
7    preservation is the first law of nature. Mr.
8    Spruell had been assaulted by Mr. Lopez with a
9    deadly weapon, a knife. It wasn't that Mr.
10   Lopez was not there to shake hands with my
11   client, as a result my client began to
12   indiscriminately fire his 22 hand gun, that he
13   found in a paper bag that had had bullets, to
14   protect himself, which he expended two rounds.
15   From other locations, other gunfire took place
16   and as a result, my client hid behind a car to
17   conceal himself and then later fled the scene
18   without firing any more shots. It has been said
19   that my client was a g- involved in a gang.
20   This can be easily misconstrued. You have to
21   remember that 20 years ago, dance groups dotted
22   California from San Diego to Eureka, emulating
23   those break dancers pop lockers from New York
24   City. Pop lockers and break dancers, as well as
25   rappers, have always been deemed to be gang
26   members. In some cases, this may be true, but
27   all pop lockers, rappers and break dancers are

99

1    not gang members and conversely, all gang

2    members are not pop lockers, break dancers or

3    rappers, either.  Mr. Vincent Spruell should be

4    found suitable for parole.  The following

5    supports Mr. Spruell's contention that he has

6    earned a second chance and being suitable for

7    parole.  He has taken responsibility for his

8    life crime, he's admitted guilt to this Board,

9    here today, and there was a finding of guilt by

10   a jury of his peers.  Mr. Spruell has a stable

11   up g- bringing.  He was raised by his mother,

12   Charlotte Pierce and his step father, Thurman

13   Dinkins.  Mr. Spruell has experienced reasonable

14   in - reasonable stable relationships with

15   others, as well.  Mr. Spruell has comm- has been

16   commended for excellent or above average work

17   performance on his current job and he is also

18   working well with his supervisors and has a good

19   attitude.  Mr. Spruell has expressed remorse for

20   his crime here, today, and to psychiatric

21   evaluators, in particular Dr. Sexton in 2004.

22   More importantly, however, Mr. Spruell has

23   demonstrated his remorse by programming here, in

24   not only Soledad, but other facilities by ap-

25   attending AA, NA, Anger Management, Impact,

26   Ethical Workshops, and United Church for all of

27   which he has certifications.  Mr. Spruell

    1    committed his crime as a result of significant

    2    stress in his life.  At that time he was trying

    3    to protect his life so he could be here, here

    4    today, or somewhere else but had he not, it very

    5    well might have been Mr. Lopez or one of the

    6    other members that I might be representing here

    7    today, had he not had a weapon.  While here at

    8    Soledad Prison, my client has engaged himself in

    9    real estate principals where he got a B+.

    10   Accounting 1 and 2, where he received a B and A,

    11   respectively.  He's received a GED, he has a

    12   High School Diploma and some currently enrolled

    13   in college where he is now waiting his Bio-

    14   Biology Final Exam scores.  At the time of his

    15   crime, Mr. Spruell was 19 years old.  He's now

    16   42.  At age 42, the probability of recidivism is

    17   vastly reduced.  In fact, one CDC Psychologist,

    18   Dr. Sexton, has (indiscernible) that Mr. Spruell

    19   poses a low degree of threat to harm.  In fact,

    20   an extremely low degree of - of harm to the

    21   public as it stands today.  His residence is

    22   assured with his brother, Thurman Dinkins, I

    23   guess Jr. and there have been many support

    24   letters submitted on his behalf.  Mr. Dinkins is

    25   a manager with Food 4 Less and he may or may not

    26   be able to give my client a job at Food 4 Less,

    27   if what the Commissioner believes is t- true,

101

1   with regards to corporations and not wanting to

2   hire Convicted Felons, right off the bat.  Mr.

3   Spruell has marketable skills, Information

4   Technology, Auto-body and fender repair, and

5   Computer repair, although he admits that he

6   would have to study some of the newer operating

7   systems and programs as they have changed over

8   the years.  My client doesn't have assigned job

9   now because he is spending most of his time

10   going through community college.  He has gone

11   through Impact and Parenting classes, as well.

12   Mr. Spruell has a network of support which

13   includes his family and in particular his

14   brother, but that family support would not be

15   there forever, people do drift away.  Parole is

16   more likely to be successful if family netw- if

17   there is a family network available.  Mr.

18   Spruell has a job offer and this will not always

19   be available, either.  Mr. Spruell's parole

20   plans are feasible and Mr. Spruell has

21   demonstrated that he can succeed without

22   resorting to violence.  Based on the foregoing,

23   we respectfully request that Mr. Spruell be

24   given a parole date and allowed to continue on

25   with his life, that he has paid his debt to

26   society as far as we see it here.(indiscernible)

27           PRESIDING COMMISSIONER INGLEE:  Thank you

102

1   very much.  Mr. Spruell, you will now have an

2   opportunity to tell us why you believe you are

3   suitable for parole.

4        **INMATE SPRUELL:**  Mr. Commissioner, I

5   can't sit here and honestly say why I should be

6   suitable for parole because I look at all the

7   people I hurt.  You know, the victim's family,

8   their - their nieces, nephews, my family, the

9   financial burden I've placed on them.  So to

10  look at things in - in that light, I was a - I

11  was a bad guy and for that I'm, I can't say but

12  I'm sorry and I am deeply sorry for that.  But

13  I- I would have to leave that in your hands as

14  I'm gonna have - I'm gonna have to do today.

15       **PRESIDING COMMISSIONER INGLEE:**  All

16  right, I thank you and now we'll go into recess

17  for deliberation.

18                  **R E C E S S**

19                    --oOo—

20

21

22

23

24

25

26

27

103

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2               **D E C I S I O N**

3        **DEPUTY COMMISSIONER MOORE:**  And it is

4    5:47.

5        **PRESIDING COMMISSIONER INGLEE:**  In the

6    matter of Vincent Spruell, S-P-R-U-E-L-L,

7    C-8-0-4-1-8, CDC number, all parties that were

8    here when we were at a recess have since

9    returned.  The Panel reviewed all information

10   received from the public and relied on the

11   following circumstances in concluding that the

12   prison is still not suitable for parole and

13   would re- pose an unreasonable risk of danger to

14   society or a threat to public safety if released

15   from prison.  Spruell, you've heard this now

16   several times, this is not anything new to you

17   and the reason I say that is I've read back

18   through all of your prior hearings.  Now let's

19   go over where we see the problem, so you'll know

20   next time around.  To start out the offense was

21   carried out, we believe, in especially cruel and

22   violent manner.  And during a fight between two

23   groups, possible gangs, but certainly two groups

24   of me- young men, the Inmate fired a weapon,

25   hitting one man and then possible killing

26   another.  Multiple victims were attacked, one

27   **VINCENT SPRUELL C-80418 DECISION PAGE 1 5/30/06**

 1  injured, one killed in the same incident.
 2  Offense was carried out in a manner which
 3  demonstrates an exceptional callous disregard
 4  for human suffering, in regard to the young man
 5  that was wounded but killed and then of course,
 6  for life of the man who was killed.  The motive
 7  of your crime was truly inexplicable.  It had
 8  all the young marks of a mindless gang killing.
 9  In this casing, it may have been a mindless -
10  mindless killing of two rival groups of young
11  men.  I want to read through the Statement of
12  Fact, which is a little bit longer then I
13  normally will do, but this is a - a somewhat
14  more involved case.  Conclusions were drawn from
15  the St- Statement of Fact that wherein the
16  prisoner and members of his local friends, or
17  gang, became involved in an altercation with
18  members of a rival group,'or gang.  In this
19  regard, Raul Lopez and Frank Trevino were
20  walking home from a party when they got into an
21  argument with a male who was riding a bicycle.
22  And then there was a group of other males, from
23  a group called the Playboys, standing around.
24  They called the two victims name, a fight broke
25  out, during the fight, the victim Lopez was
26  fighting with the Prisoner.  The Prison claimed
27  **VINCENT SPRUELL C-80418 DECISION PAGE 2 5/30/06**

105

1    that he was then stabbed by Lopez, in this

2    regard the Court of Appeals Decision indicated

3    that at the time of the booking in the Merced

4    County Jail, a photograph was taken of the

5    Inmate and in fact there was a light scratch

6    wound on the left side of his ribcage and that a

7    broken knife was found at the scene of the

8    crime.  And possibly the cause of the injury,

9    the Prisoner took out a gun, or because of the

10   injury, the Prisoner took out a gun that he

11   carried around for protection which he said he

12   had recently found in a parking lot and shot the

13   first victim, Lopez, wounding him.  The person

14   who later died, that's Mr. Trevino, came to

15   Lopez's aide and was starting to take him away

16   when he then was shot by a bullet from the

17   Prisoner's gun, in one of his arms or wrist.

18   The eventual cause of death of Trevino, was that

19   someone in the group, most likely fired a 25

20   caliber gun and struck the victim in the head,

21   killing him.  There may have been more than one

22   shooter.  This has never been resolved and if

23   there was, that shooter remains at free, -if it

24   wasn't the Inmate.  Inmate had a 22 caliber gun

25   and possibly somebody else had a 25 caliber

26   weapon.  That shooter has never been identified

27   **VINCENT SPRUELL C-80418 DECISION PAGE 3 5/30/06**

106

1    as previously noted.  After the shooting, the
2    Prisoner ran to a vehicle where he and two other
3    males left the scene.  In the vehicle, they
4    found a spent cartridge from a 25 caliber
5    weapon, yet the Inmate claims that he neither
6    heard, nor saw anybody shooting weapons from the
7    car as they were leaving.  Nor does he recall
8    ever seeing or hearing somebody close by that he
9    could specifically identify as shooting another
10   weapon.  The person, if not the Inmate, who used
11   the 25 caliber weapon, as I've already noted
12   before has not been found.  The result of this
13   incident, Trevino, age 19 died, a gunshot wound
14   to his head.  Lopez, age 22 was also wounded in
15   the gunfire by the Prisoner.  The Prisoner had a
16   pattern of juvenile crime.  In this regard it
17   started 9/8 of '75, he was arrested for Battery,
18   which was dismissed, for Child Molestation,
19   which was dismissed, for Trespassing in School
20   Grounds, which was dismissed.  1981, for Petty
21   Theft, he then was given six months in formal
22   probation, juvenile work program, '81 Violation
23   of a Curfew that's dismissed, 11/2 of 1981
24   Assault with great bodily harm, is found guilty,
25   ten day juvenile work program, ten day juvenile
26   hall.  As an adult, he was arrested on occasion,
27   VINCENT SPRUELL C-80418 DECISION PAGE 4 5/30/06

107

1    of occasions in regard to traffic violations

2    that were tied in many- in some cases, in one

3    case, in particular to alcohol. Also received

4    five days in jail on a separate traffic offense

5    and then failure to appear, additional five days

6    in jail for other traffic offenses and failure

7    to appear for offenses. You failed to profit

8    from society's previous attempt to correct his

9    criminality, in this regard to your probation.

10   Do you have a camp, county jail. And the social

11   history, unstable social history as he became

12   older can becoming involved in crime, starting

13   in 1975, which led up to the incident offense,

14   which he currently is in Prison for. While he

15   did not drink heavily or - or involved himself

16   in narcotics, he does have a history of drinking

17   and using marijuana. The Prisoner programmed

18   well while incarcerated. He has developed and

19   let me ask, could you put the - just in recess

20   for just a moment, please?

21              (Off the Record)

22       DEPUTY COMMISSIONER MOORE:  We're back

23   on.

24       PRESIDING COMMISSIONER INGLEE:  The

25   Inmate's Counsel has a - has a correction, would

26   you tell us what error I made?

27   VINCENT SPRUELL C-80418 DECISION PAGE 5 5/30/06

108

1          **ATTORNEY LEWIS:**  A mom- a moment ago, you
2     mentioned that my client had did some time as a
3     juvenile in camp or CY camp and it's actually
4     Juvenile Hall.

5          **PRESIDING COMMISSIONER INGLEE:**  All
6     right, I made that error and I'll correct that,
7     for the record that the spent ten days in
8     Juvenile Hall so that was in fact an error.  All
9     right, getting back to what he's achieved.  He
10    has developed three marketable skills that could
11    be put to use upon release.  He has upgraded
12    himself both educationally and vocationally and
13    I might indicate the fact that the Junior
14    College you're going to is - is very well
15    respected, I know it, I live relatively close to
16    it and served on their advisory board many years
17    ago.  And you have participated in beneficial
18    self help programs.  However, you have had a
19    recent 128 Counseling Chrono, you have had nine
20    since you've been in prison, the last one being
21    7/17 of 2005 for delaying a lock up.  You've had
22    two 115 Disciplinary Reports, the last being
23    7/21 of 1992, for delaying yard recall.  Your
24    psychological report, the last one is 9/23 of
25    2004, this was done by S. Sexton, S-E-X-T-O-N,
26    PhD, which is favorable.  In this regard, he
27    **VINCENT SPRUELL C-80418 DECISION PAGE 6 5/30/06**

109

1    states, the Inmate's violence potential within a
2    controlled setting is estimated significantly
3    below the rel- and relative to this level two
4    inmate population.  Combine the above with the
5    fact that the Inmate has never been a drug or
6    alcohol abuser, his precursors to violence the
7    community would be no greater than that of other
8    citizens.  In my 32 years of forensic
9    experience, nine years as a Parole Psychologist,
10   it's clear this Inmate poses less threat in a
11   community than the average parolee currently in
12   the community and no more than- no more threat
13   than the average citizen.  While I believe he's
14   being very complimentary and supportive of you,
15   I must admit that last - that last sentence is a
16   little difficult for me to comprehend and the
17   fact that you are - you pose no less of a threat
18   in the community than that of a parolee
19   currently in the community, and no more threat
20   than that of an average citizen.  In this case
21   is an average citizen who has never committed a
22   murder.  It goes on to say, in response to
23   (indiscernible) and above in the body of-the
24   support, it's indicated the Inmate has excellent
25   insight as to why he had a weapon and what
26   transpired leading to the death of the
27   **VINCENT SPRUELL C-80418 DECISION PAGE 7 5/30/06**

110

1   individual.  I'm also a little concerned in

2   regard to the fact that when you have actual

3   insight into the death of the individual, why

4   you had a weapon and what transpired leading to

5   the death of the individual.  In your case, you

6   believe it was self defense and you were

7   convicted for second degree murder.  So the,

8   hopefully the psychologist weighed those things

9   into consideration when he wrote that.  But that

10   too is a little confusing in my mind.  However,

11   it was a highly favorable report in your regard.

12   Parole Plans, you do have a viable residential

13   plans to live with your brother and then you

14   have other relatives who have also been willing

15   to support you and I'd ask you that in - in next

16   - next hearing that you in fact ask your

17   relatives and friends to put specific dates

18   down, addresses, and then sign the - sign the

19   letters.  However, I am not totally comfortable

20   with your employment plans in that your brother,

21   who apparently has some managerial level within

22   a store is able to hire and fire, I'm not sure

23   if that in the case for a company the size of

24   Food 4 Less, Food 4 Less is a pretty good sized

25   company and I'm not entirely sure who owns them

26   but I think they're owned by a larger grocery

27   **VINCENT SPRUELL C-80418 DECISION PAGE 8 5/30/06**

111

1   firm.  Usually they have very, very tight

2   policies in regard to Personnel issues and who

3   can hire and who can fire, so I would just ask

4   your brother if I'm wrong, fine, just have him

5   say that in his letter.  If I'm not wrong, then

6   have him go and - and have the correct person,

7   as I said before, either give you a job offer or

8   certainly a strong opportunity to come in and

9   interview for a position of, with the store.

10   I've said this to you a couple times, but I - I

11   assume you understand what I'm saying?

12       **INMATE SPRUELL:**  Yes.

13       **PRESIDING COMMISSIONER INGLEE:**  All

14   right.  You three marketable skills to take out

15   to the free world, if you are could have an

16   indication that you're going to be granted

17   parole at sometime in the future.  We didn't

18   receive responses to the 3042 letters that went

19   out, however we did have a presentation by

20   Deputy District Attorney of Merced County, in

21   this regard they have recommended against

22   parole, at this time.  For the recent 128, the

23   Prisoner's gains are relatively recent and he

24   must demonstrate the ability to be able to go

25   for a period of time without any 128's, I

26   strongly suggest the time that you come in here

27   VINCENT SPRUELL C-80418 DECISION PAGE 9 5/30/06

112

1   again, that you not have any disciplinary

2   problems even a 128.  However, you should be

3   commended for many things, you have done well in

4   - in programming and I'll ask the Deputy

5   Commissioner if she would go over those.

6        **DEPUTY COMMISSIONER MOORE:**  There are a

7   several things to commend you on, you are very

8   positive in how you have spent your time here.

9   Very strong vocational training and you continue

10  to use that training in your work in which

11  you've received laudatory chronos.  You have

12  excelled and received nothing but exce-

13  excellent evaluations.  Continue with both of

14  those, if there's any more upgrading that you

15  can do towards your goal with your college

16  degree about computer, it sounds more like

17  hardware and repair, if there's anymore

18  vocational training that you can seek while you

19  are here, I think it's already on your mind to

20  do, please do that.  Your academic upgrading is

21  commendable.  You have moved now into getting

22  your general education course equivalence

23  towards a Adminis- Associate of Arts Degree,

24  good luck with your Biology Exam.  Continue good

25  work there.  Laudatory Chronos for participating

26  and being helpful, showing initiative, and also

27  **VINCENT SPRUELL C-80418 DECISION PAGE 10 5/30/06**

113

1   participating in - in a program that was
2   available to you.  I would also indicate that
3   you have no violence in your limited 115 and 128
4   history, although your recent 128 indicates
5   several counseling sessions before being issued
6   the 128, which shows some concerns about, there
7   are rules in here that are very particular and -
8   and having to conform with those.  I would - I
9   do want to comment on your attendance at AA.  A
10  number of inmates appear before us who are not
11  alcoholics or addicts that a- attend AA, but
12  generally what I've heard from them is that they
13  have identified something that they're powerless
14  over.  I did not hear that from you and going,
15  there are a number of people who do attend and
16  gain a number of things from attending AA, I
17  haven't heard from you what you have gained.  If
18  you are going to continue and I don't discourage
19  you from that but to develop a better
20  understanding of what living- what the
21  principals are behind those 12 steps and how to
22  live according to those principals.  Find out if
23  Step six and seven apply in your life.  Find out
24  if you have footwork to do behind Step nine.
25  Going to AA is just not a place to stay busy and
26  program, there have to be, you have to be able
27  **VINCENT SPRUELL C-80418 DECISION PAGE 11 5/30/06**

114

1     to pull something from it for it to mean
2     something.  Otherwise it's just seen as a box
3     check and I would encourage you to develop that
4     if you do continue to attend.  Thank you and
5     good luck to you.

6         **PRESIDING COMMISSIONER INGLEE:**  These
7     positive aspects of your behavior do not
8     outweigh the factors of unsuitability, therefore
9     we are denying again for one year.
10    (indiscernible) we believe that you are continue
11    to minimize your relationship to the killing.
12    We have - we believe you have therefore have
13    insight, you have a discipline issue of 7/17 of
14    2005 and we also have to consider that there is
15    possibly another shooter out there someplace who
16    you may already be - you may have some awareness
17    of or some insight as to who this person may
18    have been.  However, regardless we believe that
19    you need another year before you should be able
20    to give - given opportunity for a grant, also
21    give a lot of consideration to your Parole
22    Plans, when you come back in the next time.  We
23    want you to remain disciplinary free, you've
24    already done very good vocationally, you're
25    gonna continue to upgrade yourself educationally
26    and continue participating in self help programs
27    **VINCENT SPRUELL C-80418 DECISION PAGE 12 5/30/06**

115

1    as the opportunity present themselves.    With

2    that I wish you good luck.    The time is 6:07

3    p.m.

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR                SEP. 2 7 2006

24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    VINCENT SPRUELL C-80418 DECISION PAGE 13 5/30/06

116

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, LEEANNA L. BROWN, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 115, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF  VINCENT

SPRUELL, CDC NO. C-80418, ON MAY 30, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated AUGUST 13, 2006, at Sacramento,

California.

LEEANNA L BROWN
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT

# B

SENT TO I/M ON _10-1-04_

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### NOVEMBER 2004 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### SEPTEMBER 23, 2004

This is the fifth updated psychological evaluation for the Board of Prison Terms on inmate Vincent Spruell, CDC# C-80418. This report is based on a psychodiagnostic interview of the inmate conducted on 09/23/04, lasting approximately 90 minutes. The inmate's central file and unit health record were also reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Spruell was born on 02/23/64, and is currently 40 years of age. He continues to be in excellent physical health, with no current treatment needs. He has no known psychiatric history, and is not currently receiving psychiatric services at the institution. The inmate has been incarcerated for approximately 21 years, as he was sentenced to 15 years, plus eight. With his good time, the inmate reached his earliest possible parole date in 1996, approximately eight years ago.

When inmate Spruell was asked about the commitment offense, his response was very similar to that reported by Dr. Gleason in her report to the Board of Prison Terms on 08/18/03. The inmate accepted complete responsibility for his inappropriate behavior. He was genuinely remorseful for his behavior and the resulting death. His understanding of the circumstances which led to offense, and how to avoid them, was excellent. His judgment has vastly improved over the last 21 years.

As has been reported in earlier Board of Prison Terms reports, the inmate is extremely well trained in vocational areas, and has several certificates of completion. This notwithstanding, he continues to seek training, and is self-motivated to improve. Currently, the inmate is working at CTF's computer lab as a computer technician, earning approximately $27 a month. His skill level indicates that he could obtain employment in the community on parole relatively easily. His parole plans in this area appear to be excellent, and he has full family support.

In reviewing the central file and the inmate's significant growth over his 21 years of incarceration, no additional self-help programs can be recommended at this time. It is obvious from my interaction with the inmate that he is a civilized member of society that is ready for parole.

In assessing inmate Spruell's current mental status, it became clear that the inmate does not suffer from any Axis I or Axis II disorder. It is clear that he does not suffer from a mood or psychotic disorder. Although at one time he may have qualified as an antisocial personality disorder, that diagnosis is no longer appropriate, as he shows no traits of this disorder. The following diagnosis is offered:

SPRUELL, VINCENT
CDC NUMBER: C-80418
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | V71.09 – No Contributory Clinical Disorder. |
| AXIS II: | V71.09 – No Contributory Personality Disorder. |
| AXIS III: | No Contributory Physical Disorder. |
| AXIS IV: | Lifer incarceration. |
| AXIS V: | Current GAF = 90. |

Inmate Spruell's prognosis for maintaining his present gains in the community upon parole is excellent.

The parole board specifically requested that this evaluation be directed towards:

A. The prisoner's violence potential in the free community.

B. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes.

C. "Explore prisoner role in the C/O. Also, his insight into why he had a weapon and shot the victim, and events leading to the crime."

With regard to inmate Spruell's violence potential in the free community, one need only look to his behavior in the institutional setting as a precursor to his community adjustment. The inmate has not received a CDC-115 in over 12 years. During his entire incarceration, he has only received two 115s. He received one in 1992 for inciting disruptive behavior. The inmate was found guilty, but only assessed 30 days loss of work time credits and assessed ten days of disciplinary detention. His second CDC-115 was received on 07/21/92 for delaying yard recall. However, in reviewing the original CDC-115 charges, it is noted that this 115 was reduced to an administrative 128. So, in actuality, the inmate has only one CDC-115 of only minor consequence in his 21-year incarceration.

As a result of all of the above, the inmate's violence potential within a controlled setting is estimated to be significantly below average relative to this level II inmate population.

Combining the above with the fact that the inmate has never been a drug or alcohol abuser, his precursors to violence in the community would be no greater than any other citizen. With my 32 years of forensic experience (nine years as a parole psychologist), it is clear that this inmate poses less threat in the community than the average parolee currently in the community, and no more threat than the average citizen.

In response to items B and C listed above, in the body of this report, it was indicated that the inmate has excellent insight into why he had a weapon, and what transpired leading to the death of an individual. His judgment and maturity

SPRUELL, VINCENT
CDC NUMBER: C-80418
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

at present has been well documented in previous psychiatric reports. It is clear
that the inmate is a much different man than the 19-year-old adolescent who
committed the instant offense.

In considering all of the above, my conclusions are the same as those reached by
the CC-I in the present report to the Board of Prison Terms, and I quote,
"Considering the commitment offense, prior record, and prison adjustment, this
writer believes Spruell would probably pose a low degree of threat to the public at
this time if released from prison."

S. Sexton, Ph.D.
Consulting Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SS/gmj

D: 09/23/04
T: 09/27/04

*D:\Word Files\BPT - 2004\SPRUELL, VINCENT   C-80418   09-04   SEXTON.doc*

SPRUELL        C-80418        CTF-CENTRAL        09/23/04        gmj

# E X H I B I T

# C

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
SEPTEMBER 2004 CALENDAR

SPRUELL, VINCENT                                    C-80418

I.   **COMMITMENT FACTORS:**

   A.   **Life Crime:**  PC 187, Murder Second with Use of a Firearm, PC 12022.5, Count 1. Assault with Firearm, PC 245 (a) (2), with Great Bodily Injury, PC 12022.7. Merced County, Case #11630. Sentence: 15 years to Life plus eight (8) years. MEPD: 11-07-97. Received by CDC on 02-09-84. Victim: Frank Trevino, age 19 years (decreased) and Raul Lopez, age 22 years.

      1.   **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and this writer has no further information to add.

      2.   **Prisoner's Version:** Remains the same as stated in the previous hearing.

      3.   **Aggravating/Mitigating Circumstances:**

         a.   **Aggravating Factors:** Remains the same as stated in the previous hearing.

         b.   **Mitigating Factors:** Remains the same as stated in the previous hearing.

   B.   **Multiple Crime(s):** N/A

      1.   **Summary of Crime:** N/A

      2.   **Prisoner's Version:** N/A

II.  **PRECONVICTION FACTORS:**

   A.   **Juvenile Record:** Remains the same as stated in the previous hearing.

   B.   **Adult Convictions:** Remains the same as stated in the previous hearing.

   C.   **Personal Factors:** Remains the same as stated in the previous hearing.

SENT TO I/M ON   8-16-04

LIFE PRISONER EVALL       EPORT
PAROLE CONSIDERATIO.. h..ARING
SEPTEMBER/2004 CALENDAR

III.   POSTCONVICTION FACTORS:

   A.   Special Programming/Accommodations:  None

   B.   Custody History:  Documents from the previous hearing have been considered
        and the information remains valid.  During the period of time since the last
        hearing (09-15-03), Spruell's behavior has been positive, in that he has remained
        disciplinary free and received exceptional work reports at his assignment in the
        Dining Hall and Computer Repair.

   C.   Therapy and Self-Help Activities:   Spruell has participated in Alcoholics
        Anonymous and enrolled in an Independent Study Program through Coastline
        Community College.

   D.   Disciplinary History:   Spruell has received eight (8) CDC 128A's and two (2)
        CDC 115's. See Disciplinary Sheet for details.

   E.   Other:  A Subsequent Parole Hearing was held on 09-15-03.   The Board
        recommended he remain disciplinary free, and participate in self-help.  Parole was
        denied an additional one year.

IV.   FUTURE PLANS:

   A.   Residence   Spruell plans to reside with his brother, Thurmond Dinkins at 2993
        Tahoe Drive, Merced, California (209) 383-3426.

   B.   Employment:   Spruell plans to work at Food for Less where his brother is
        manager.

   C.   Assessment:  Spruell has valid work skills, a place to live and support from his
        family.

V.   USINS STATUS:  No holds

VI.   SUMMARY:

   A.   Considering the commitment offense, prior record and prison adjustment, this
        writer believes Spruell would probably pose a low degree of threat to the public at
        this time, if released from prison.  This is based on the fact that Spruell has

LIFE PRISONER EVAL    .EPORT
PAROLE CONSIDERATIO HEARING
SEPTEMBER/2004 CALENDAR

remained disciplinary free since 1992 and has exceptional work reports. Spruell has attempted to meet the BPT recommendations.

B.   Prior to release the prisoner could benefit from continuing to remain disciplinary free and participating in Alcoholics Anonymous.

C.   This Board report is based upon one hour interview, incidental contact in the housing unit and a review of the Central file lasting one hour.

D.   Spruell was afforded an opportunity to review his Central File on 06-01-04, refer to chrono dated same date.

E.   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

## DISCIPLINARY SHEET

CDC 128A's Counseling Chrono

| 06-09-01 | MCSP | Being in an unauthorized area |
| 12-21-90 | MCSP | Failed to report to work |
| 01-29-89 | CTF-C | Physical altercation, reduced from CDC 115 |
| 01-10-88 | CTF-C | Unexcused absence |
| 01-14-86 | CTF-C | Delaying lock up |
| 07-11-86 | CTF-C | Disrespect to staff |
| 10-01-85 | CTF-C | Standing for count |
| 08-29-85 | CTF-C | Out of bounds |

CDC 115's Rules Violation Report

| 07-21-92 | MCSP | 3005© | Delaying yard recall, guilty, reduced to administrative |
| 04-14-92 | MCSP | 3005© | Inciting disruptive behavior, guilty, assessed 30 days loss of credit. |

SPRUELL                    SEPTEMBER 2004                    C-80418

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 09-2003 to present | | | **PLACEMENT**: Remained at CTF<br>**CUSTODY**: Medium A<br>**VOC. TRAINING**: Assigned to Computer Repair<br>**ACADEMICS**: Enrolled in an Independent Study Program through Coastline Community College<br>**WORK RECORD**: Was temporaily assigned to the Dining Hall while Computer Repair was closed<br>**GROUP ACTIVITIES**: Participation in Alcoholic Anonymous<br>**PSYCH. TREATMENT**: None noted this period.<br>**PRISON BEHAVIOR**: No disciplnaries<br>**OTHER**: N/A |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | | DATE 8-5-04 |
|---|---|---|---|
| SPRUELL | C-80418 | CTF-SOLEDAD | SEPT. 2004 |

M. Rulio CCI

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                                Page __1__

LIFE PRISONER EVALL   .   :EPORT
PAROLE CONSIDERATION HEARING
SEPTEMBER/2004 CALENDAR

M. Rulio                    8-5-04

M. Rubio                         Date
Correctional Counselor I

4. L.R. Baker              8-5-04

A. Padilla                       Date
Correctional Counselor II

J. Clancy                   8/5/04
Facility Captain                 Date

D. S. Levorse               8-9-04

                                 Date
Classification and Parole Representative

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
#### (C.C.P. §§ 1013(A), 2015,5)

I, _Vincent L. Sprwell_____, declare:

I am over 18 years of age and I am party to this action.  I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California.  My prison address is:

_Vincent L. Sprwell_, CDCR #:_C-80418_____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: _Y20-321 Low_
SOLEDAD, CA  93960-0689.

On _Feb. 23, 2008_____, I served the attached:

_Petition for writ of Habeas Corpus and Exhibits_____

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined.  The envelope was addressed as follows:

office of the Clerk, U.S. District Court          Attorney General office
Northern District of Calif.                       P.O. Box 944255
450 Golden Gate Avenue                            Sacramento, Calif.
San Francisco, Calif. 94102                                        94244

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Executed on _Feb. 23, 2008___.

_Vincent L. Sprwell_
_Vincent L. Sprwell_
Declarant

CLOSED, E-Filing, HABEAS, ProSe

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:05-cv-05183-MMC
## Internal Use Only

Spruell v. Kane et al
Assigned to: Hon. Maxine M. Chesney
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 12/14/2005
Date Terminated: 12/07/2007
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Petitioner**

**Vincent Lamell Spruell**

represented by **Vincent Lamell Spruell**
Soledad State Prison
C-80418
P.O. Box 689
Soledad, CA 93960
PRO SE

V.

**Respondent**

**Warden A. Kane**

represented by **Amber Nicole Wipfler**
Office of the Attorney General
Correctional Law Section
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004
(415) 703-5721
Fax: (415) 703-5843
Email: amber.wipfler@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**Board of Prison Terms**

**Respondent**

**State of California**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/14/2005 | 🔵1 | PETITION for Writ of Habeas Corpus (Filing fee $ 5.00; receipt number 3379434). Filed byVincent Lamell Spruell. (aaa, Court Staff) (Filed on 12/14/2005) (Entered: 12/15/2005) |
| 05/25/2006 | 🔵2 | ORDER TO SHOW CAUSE: The Clerk of the Court shall serve by certified mail a copy of this order and the petition, along with all attachments thereto, upon respondent and respondent's attorney, the Attorney General for the State of California. Respondent shall file with the Court and serve on petitioner, **within 60 days** of the date this order is |

| | | filed, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted based on petitioner's cognizable claim signed by Judge Maxine M. Chesney on May 25, 2006. (mmcsec, COURT STAFF) (Filed on 5/25/2006) Modified on 6/1/2006 (aaa, Court Staff). (Entered: 05/25/2006) |
|---|---|---|
| 06/01/2006 | ❑ | Sent by CERTIFIED MAIL a copy of 2 Order to Show Cause and a copy of the Petition to Respondent Anthony Kane, Warden of the Department of Corrections & Rehabilitation of Soledad California and to Respondent California board of Prison Terms and to the California State Attorney General's Office. (aaa, Court Staff) (Filed on 6/1/2006) (Entered: 06/01/2006) |
| 06/09/2006 | ❑ | Re 2 Order to Show Cause was returned to the Court regarding Warden Anthony Kane. Telephoned Soledad State Prison to inquire the correct address for Warden Kane. Was informed that Warden Kane no longer works at Soledad State Prison. Re-sent by CERTIFIED MAIL a copy of 2 Order to Show Cause and the Petition to the Warden (no name) of Soledad State Prison. (aaa, Court Staff) (Filed on 6/9/2006) (Entered: 06/12/2006) |
| 07/24/2006 | ❑3 | ANSWER/RESPONSE to 1 Petition for Writ of Habeas Corpus byA. Kane. (aaa, Court Staff) (Filed on 7/24/2006) (Entered: 07/25/2006) |
| 07/24/2006 | | (Court only) ***Attorney Amber Nicole Wipfler for A. Kane added. Re 3 Answer (aaa, Court Staff) (Filed on 7/24/2006) (Entered: 07/25/2006) |
| 08/10/2006 | ❑4 | Traverse TO RESPONDENT'S ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF byVincent Lamell Spruell. (aaa, Court Staff) (Filed on 8/10/2006) (Entered: 08/11/2006) |
| 05/11/2007 | ❑5 | ORDER RE ELECTRONIC FILING IN CASES WITH UNREPRESENTED PARTIES: Case designated for electronic filing. Effective immediately all represented parties will e-file their submissions to the court. Represented parties will be required to serve paper copies by mail on unrepresented parties. Unrepresented litigants will continue to file and serve all submissions to the court in paper form unless prior leave is obtained from the assigned judge. Signed by Chief Judge Vaughn Walker dated 5/11/07. Copy mailed to counsel of record. (aaa, Court Staff) (Filed on 5/11/2007) (Entered: 05/17/2007) |
| 12/07/2007 | ❑6 | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS. Signed by Judge Maxine M. Chesney on December 7, 2007. (mmcsec, COURT STAFF) (Filed on 12/7/2007) (Entered: 12/07/2007) |
| 12/07/2007 | ❑ | (Court only) ***Civil Case Terminated. (mmcsec, COURT STAFF) (Filed on 12/7/2007) (Entered: 12/07/2007) |
| 12/10/2007 | ❑7 | JUDGMENT: The petition for a writ of habeas corpus is hereby DENIED. (tl, COURT STAFF) (Filed on 12/10/2007) (Entered: 12/10/2007) |

P.O. Box 2081, 1-3021L
Soladad Ca 93962

RECEIVED

FEB 27 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Office of The Clerk
U.S. District of Calif.
Northern District of Calif.
450 Golden Gate Ave.
San Francisco, Ca. 94102